**<u>EXHIBIT A</u>**

**Second Amended Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| UTGR, INC. d/b/a TWIN RIVER, <u>et al.</u>,[1] | ) Case No. 09-12418 (ANV) |
|  | ) Jointly Administered |
|  | ) |
|  | ) |

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT
<u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, Rhode Island 02903
Telephone:  (401) 273-8300
Facsimile:  (401) 272-5728
Allan M. Shine
Diane Finkle

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Paul M. Basta
Stephen E. Hessler

Dated:   January 26, 2010                    Counsel to the Debtors and Debtors in Possession

---

[1]    The Debtors in these chapter 11 cases are BLB Management Services, Inc., BLB Worldwide Holdings, Inc. and UTGR, Inc.

# TABLE OF CONTENTS

Page

Important Information About this Disclosure Statement ...................................................................4

Questions and Answers Regarding this Disclosure Statement and the Plan ......................................6

The Debtors' History and Chapter 11 Cases .................................................................................13

Plan Overview ............................................................................................................................19

Treatment of Claims Against and Equity Interests in the Debtors ..................................................20

Management of the Company ......................................................................................................29

Composition of New Board of Directors ........................................................................................29

The Debtors' Business Upon Emergence ......................................................................................30

The Debtors' Capitalization After Emergence ...............................................................................33

Description of Capital Stock ........................................................................................................33

Limitations on Liability and Indemnification of Directors and Officers ...........................................34

Summary of Legal Proceedings ...................................................................................................34

Projected Financial Information ...................................................................................................35

Risk Factors ..............................................................................................................................36

Confirmation of the Plan .............................................................................................................41

Effect of Confirmation of the Plan ...............................................................................................46

Important Securities Law Disclosure ...........................................................................................50

Voting Instructions .....................................................................................................................51

Certain U.S. Federal Income Tax Consequences of the Plan .........................................................53

Recommendation ......................................................................................................................61

**EXHIBITS**

EXHIBIT A        Second Amended Joint Plan of Reorganization

EXHIBIT B        Disclosure Statement Order

EXHIBIT C        Reorganized Debtors' Financial Projections

EXHIBIT D        Reorganized Debtors' Valuation Analysis

EXHIBIT E        Liquidation Analysis

EXHIBIT F        Reconciliation of Non-GAAP Measures

**Important Information About this Disclosure Statement**

This Disclosure Statement provides information regarding the Second Amended Joint Plan of Reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court.

The Second Amended Joint Plan of Reorganization is supported by all of the Debtors' key stakeholders; including, specifically, the Debtors' First Lien Lenders, the Official Committee of Unsecured Creditors, and Dimeo Construction Company, as demonstrated by the global resolution (the "Global Resolution") reached on January 25, 2010 between and among the above parties. The Global Resolution provides for the following: a 65% recovery to general unsecured creditors in Class C-5 (with such distribution to be paid in equal installments on each of the Effective Date of the Plan and December 20, 2010, or in a single installment on the Effective Date, if the Effective Date occurs in 2011) and a convenience class of $2,500 (Class C-6); and the Creditors' Committee and Dimeo shall immediately withdraw their objections to the Disclosure Statement [Docket Nos. 464 and 466], support the Plan (including the terms of the Restructuring Agreement), and the scheduling of a hearing no later than March 16, 2010 to confirm the Plan. The Global Resolution also resolves the United States Trustee's objection to the Disclosure Statement. In addition, the Creditors' Committee has further agreed to immediately dismiss with prejudice their adversary proceeding commenced against the First Lien Agent and other parties, Case No. 10-ap-01106 [Docket No. 1]. A substantial number of Second Lien Lenders supported the Restructuring Agreement, and none of the Second Lien Lenders objected to the Disclosure Statement. As a result of the Global Resolution, the Debtors and their key stakeholders anticipate the Plan will be largely (if not entirely) consensual.

The Debtors believe the Plan is in the best interests of all creditors. The Debtors urge all creditors entitled to vote on the Plan to vote in favor of the Plan.

**References to the "Plan" and the "Plan of Reorganization" are to the Second Amended Joint Plan of Reorganization attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.**

**References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the District of Rhode Island, the court in which the debtors indicated on the cover of this Disclosure Statement (collectively, the "Debtors") filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code. References to the "Petition Date" are to June 23, 2009.**

**Unless the context requires otherwise, references to the "Company," "UTGR," "our," and "us" are to the Debtors.**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as Exhibit A hereto, and the section herein entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for the purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, the Plan documents, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning the Debtors or the value of the Debtors' properties have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The shares of the New Common Stock described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or on registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;
- financing plans;
- projected dividends;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;
- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing products and services;
- projected general market conditions; and
- effects of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements

to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potentially adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- customer response to the Chapter 11 Cases;

- inability to have claims discharged/settled during the chapter 11 proceedings;

- general economic, business and market conditions;

- interest rate fluctuations;

- a decline in the Debtors' market share due to competition;

- ability to implement cost reduction initiatives in a timely manner;

- financial conditions of the Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- changes in domestic laws and regulations;

- general market conditions;

- natural disasters; and

- geopolitical instability.

### Questions and Answers Regarding this Disclosure Statement and the Plan

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval for their Plan.  Prior to soliciting acceptances of the proposed Plan, the Debtors are required by section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan?  What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of claim or interest you hold.  The classes of claims and interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|-------|---------------------|--------|---------------|------------------------|--------------------------|
| **Claims against and Interests in BLB Worldwide Holdings** | | | | | |
| A-1 | First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims | Impaired | Entitled to Vote | 89%[2] | 0% |
| A-2 | Second Lien Facility Guarantee Claims | Impaired | Entitled to Vote | N/A | 0% |
| A-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| A-4 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| A-5 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 65% | 0% |
| A-6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| A-7 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| **Claims against and Interests in BLB Management Services** | | | | | |
| B-1 | First Lien Facility Claims and Swap Agreements Claims | Impaired | Entitled to Vote | 89%[3] | 12-66% |
| B-2 | Second Lien Facility Claims | Impaired | Entitled to Vote | N/A | 0% |
| B-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| B-4 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |

---

[2]    As explained in greater detail in the Valuation Analysis, attached as Exhibit D to the Disclosure Statement, Lazard estimates that the reorganization value of the Debtors falls within a range of approximately $341 million to $404 million, with a midpoint of $373 million. For the purposes of the Valuation Analysis, Lazard assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date. Including Excess Cash of approximately $18 million as of the Assumed Effective Date and the estimated net realizable equity value of Mile High of approximately $7 million, the estimated Distributable Value is approximately $366 million to $430 million, with a midpoint of $398 million.  Based on an estimated net debt balance of approximately $271 million projected as of the Assumed Effective Date (debt of $300 million *minus* management's estimate of cash needed to operate the business of approximately $29 million), Lazard's midpoint estimate of Distributable Value implies an equity value of the Reorganized Debtors of approximately $127 million.  Based on the foregoing claim amount and reorganization value, Holders of Class A-1, Class B-1 and Class C-1 Claims will receive a distribution equal to 89% of their Allowed Claim.

[3]    See supra note 2.

7

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| B-5 | General Unsecured Claims and Rejection Damages Claims | Impaired | Entitled to Vote | 65% | 0% |
| B-6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| B-7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| **Claims against and Interests in UTGR** | | | | | |
| C-1 | First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims | Impaired | Entitled to Vote | 89%[4] | 12-66% |
| C-2 | Second Lien Facility Guarantee Claims | Impaired | Entitled to Vote | N/A | 0% |
| C-3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| C-4 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| C-5 | General Unsecured Claims, the RIGOA Claim, the Dimeo Claim, and Rejection Damages Claims | Impaired | Entitled to Vote | 65% or election into Class C-6 Convenience Claims | 0% |
| C-6 | Convenience Claims | Impaired | Entitled to Vote | up to 100% | 0% |
| C-7 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| C-8 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |

For more information about the treatment of claims and interests see "Treatment of Claims Against and Equity Interests in the Debtors," which begins on page 20.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, the Debtors may be sold as a going concern or shut down and sold on an asset-by-asset basis. In either scenario, the Debtors would be required to liquidate all of the assets related

---

[4]    Id.

to Twin River and use the proceeds to pay the amounts outstanding under the First Lien Facility. There would not be a recovery for holders of Second Lien Facility Claims, administrative and priority claims, or for holders of any other claims, including general unsecured claims, and the recovery for the First Lien Lenders would be significantly reduced compared to the recoveries shown on page 7. For a more detailed description of the consequences of a liquidation scenario, see "Best Interests of Creditors" beginning on page 43 and the Liquidation Analysis attached as Exhibit E to this Disclosure Statement.

**If the Plan provides that I get a distribution, do I get it upon confirmation or when the Plan goes effective, and what is meant by "confirmation," "effective date" and "consummation?"**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "effective date" mean the date on which the Plan has been fully consummated and that all conditions to the Plan have been satisfied or waived. Distributions will only be made after consummation of the Plan. See "Confirmation of the Plan," which begins on page 41, for a discussion of the conditions to consummation.

**Where is the cash required to fund the Plan coming from?**

The cash distributions under the Plan shall be funded from the Reorganized Debtors' cash balances and/or cash from business operations. See "Plan Overview," which begins on page 19.

**Are there risks to owning an interest in the Debtors upon emergence from bankruptcy?**

Yes, please see "Risk Factors," which begins on page 36.

**Is there potential litigation related to the Plan?**

Yes, in the event it becomes necessary to confirm the Plan over the objection of certain classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of certain classes of claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class of claims if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

In accordance with the terms of the Bankruptcy Court order approving this Disclosure Statement, all parties in interest will receive notice of the hearing on the confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: www.donlinrecano.com/twinriver.

**Will the Debtors be filing reports with the SEC?**

The Debtors will not file reports with the SEC upon emergence as they will not be subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended, or the regulations promulgated thereunder upon emergence.

**What rights will the Debtors' new stockholders have?**

Each holder of New Common Stock or Newco Common Stock (if created) issued under the Plan will be entitled to one vote per share of New Common Stock or Newco Common Stock (if created) on all matters subject to a vote of common stockholders under applicable state law and will be entitled to a pro-rata share of any dividends

that are declared by the Debtors' board of directors.  The New Common Stock or Newco Common Stock (if created) shall be the sole class of voting stock.  On the effective date of the Plan, the Debtors shall authorize and issue an amount of shares of New Common Stock or Newco Common Stock (if created) sufficient to satisfy its obligations under the Plan.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes, see "Releases," which begins on page 48.

**What is the deadline to vote on the Plan?**

[ ] p.m. (prevailing Eastern Time) on [ ].

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of claims entitled to vote on the Plan.  If you are a holder of claims in the following classes, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided to Class A-1, Class A-2, Class A-5, Class B-1, Class B-2, Class B-5, Class C-1, Class C-2, Class C-5 and Class C-6.

The Debtors have retained Donlin, Recano & Company, Inc. ("Donlin"), to serve as the Notice, Claims and Solicitation Agent to oversee the voting process, provide additional copies of all materials and answer questions. The Notice, Claims and Solicitation Agent will also process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is [ ] p.m. (prevailing Eastern Time), on [ ].

---

**BALLOTS**

Ballots must be actually received by the Notice, Claims and Solicitation Agent by the voting deadline of [ ] p.m. (prevailing Eastern Time) on [ ] at the following address:

**If by mail:**

**Donlin, Recano & Company, Inc.**
**Re:  UTGR, Inc. d/b/a Twin River, et al.**
**Attn:  Voting Department**
**P.O. Box 2034**
**Murray Hill Station**
**New York, New York  10156**

**If by hand delivery or overnight courier:**

**Donlin, Recano & Company, Inc.**
**Re:  UTGR, Inc. d/b/a/ Twin River, et al.**
**Attn:  Voting Department**
**419 Park Avenue South, Suite 1206**
**New York, New York  10016**

If you have any questions on the procedure for voting on the Plan, please call the Notice, Claims and Solicitation Agent at the following telephone number:

(212) 771-1128

---

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed, signed and received by [ ] p.m. (prevailing Eastern Time), on [ ].

Any ballot that is properly executed by the holder of a claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each holder of a claim may cast only one ballot per each such claim held.  By signing and returning a ballot, each holder of a claim in Class A-1, Class A-2, Class A-5, Class B-1, Class B-2, Class B-5, Class C-1, Class C-2, Class C-5 and Class C-6 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such claim and/or equity interest have been cast or, if any other ballots have been cast with respect to such class of claims and/or equity interests, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot.

**Why is the Bankruptcy Court holding a confirmation hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

**When is the confirmation hearing scheduled to occur?**

The Bankruptcy Court has scheduled the confirmation hearing for [ ] to take place at [ ] before the Honorable Arthur N. Votolato, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Rhode Island, located at The Federal Center, 380 Westminster Street, Providence, Rhode Island 02903. The confirmation hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the confirmation hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [ ] at [ ] p.m. (prevailing Eastern Time) in accordance with the notice of the confirmation hearing that accompanies this Disclosure Statement. Unless objections to confirmation of the Plan are timely served and filed in compliance with the disclosure statement order, they may not be considered by the Bankruptcy Court.

The Debtors will publish the notice of the confirmation hearing, which will contain the deadline for objections to the Plan and the date and time of the confirmation hearing, in *The Providence Journal* to provide notification to those persons who may not receive notice by mail.

**What is the purpose of the confirmation hearing?**

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose prior to the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**What role does the Bankruptcy Court play after the confirmation hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any claims or interests arising under the Chapter 11 Cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of claims against the Debtors are accomplished pursuant to the Plan. See "Retention of Jurisdiction by the Bankruptcy Court," which begins on page 46, for a further description of the matters over which the Bankruptcy Court will retain jurisdiction following the confirmation of the Plan.

**What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. See "The Debtors' Business Upon Emergence," beginning on page 30, for a further description of the effect of the Plan on the Debtors' ongoing business.

**Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

Yes. Under the Plan, the First Lien Lenders will own all of the New Common Stock or Newco Common Stock (if created) and thus will be able to significantly influence the management and affairs of the Debtors, and all matters requiring the vote or approval of holders of any of such securities. In addition, and as further set forth on page 29 of this Disclosure Statement describing the composition of the new board of directors of the Reorganized Debtors and Newco (if created), the First Lien Lenders will designate the three initial members of the new board.

**Do the Company and its key stakeholders recommend voting in favor of the Plan?**

Yes.  In the opinion of the Debtors, the Plan is preferable to the liquidation alternatives described in this Disclosure Statement because the Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  Confirmation of the Plan will also allow the Debtors to continue to operate as a going concern, which will have the effect of preserving jobs at the Debtors' Twin River facility.  Accordingly, the Debtors recommend that holders of claims who are entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Further, pursuant to the Global Resolution described on page 4 above, the Debtors' First Lien Lenders, the Creditors' Committee, and Dimeo also support approval of the Plan.  The Global Resolution also resolves the United States Trustee's objection to the Disclosure Statement.

## The Debtors' History and Chapter 11 Cases

**The Debtors' Business—Overview and History**

The Debtors' principal business is owning and operating Twin River, a gaming facility and greyhound racing track located in Lincoln, Rhode Island.[5]  Originally constructed in the 1940s for thoroughbred horse racing, Twin River was converted for greyhound dog racing in the 1970s, and it became authorized to house video lottery terminals ("VLTs") in 1992.  Currently, the facility offers 4,752 VLTs, virtual blackjack and roulette tables, as well as live greyhound racing.  The Debtors also operate simulcasting operations, which allow customers to wager on greyhound races from states around the country, including New York, Kentucky, Florida, and California.  Twin River also exports its signal to tracks throughout the country.  Twin River is one of just two entities in Rhode Island licensed to operate VLTs.

BLB Investors, L.L.C., ("BLB Investors"), the direct and indirect parent of the Debtors, was formed in March 2004 as a joint venture among three of the world's most accomplished leisure and gaming operators, developers, and managers:  an investment affiliate of Starwood Capital Group Global I, LLC; an investment subsidiary of Kerzner International Ltd.; and an investment subsidiary of Waterford Group, LLC (together, the "Sponsors").  In July 2005, the Company acquired 100% of the equity of the U.S. operations of Wembley plc, including the Twin River facility.  Rhode Island's Department of Business Regulation authorized the transfer of the Twin River operating license to the Company and the State legislature approved the Master Video Lottery Terminal Contract (the "VLT Contract").  The VLT Contract is a potential 15-year arrangement with the Company (five-year initial term, renewable by the Company (upon satisfaction of certain conditions precedent) for two additional five-year terms) that provides for, among other things, revenue sharing with the State and other stakeholders and commitments by the Company to invest $125 million in capital improvements in, and create new jobs at, Twin River.

At the time the Company purchased Twin River, the facility was an outdated and underperforming gaming facility, marred by the criminal indictment of its then-owners and other allegations of malfeasance.  Specifically, in 2003, two former executives of Wembley plc were convicted of conspiring to bribe a speaker of the Rhode Island House of Representatives.  By 2007, the Company completed an approximately $220 million expansion and rebranding of Twin River, which brought its total gaming space up to 156,000 square feet—increasing the number of VLTs by more than 50% to 4,752—and added fine dining, entertainment venues and meeting spaces.  The renovations also included a completely refurbished grandstand, increased parking, and related improvements for the greyhound race track.  As a result, Twin River's revenues have improved year over year even as Twin River's primary competitors' revenues have slipped.

---

[5]     Non-debtor affiliates of the Debtors own two greyhound racing tracks, a horse racing track, and an event center in Colorado.

**The Debtors' Organizational Structure**

The chart on the following page depicts the Debtors' corporate and capital structure.



**The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' total funded debt was approximately $560 million, which consists of the total principal amount outstanding under the First Lien Facility and the Second Lien Facility.

<u>The First Lien Facility</u>

The Debtors' first lien debt is comprised of a $420 million first priority credit facility, consisting of a $125 million revolving loan due July 18, 2010 and a $295 million term loan due July 18, 2011, issued pursuant to that certain Third Amended and Restated Credit Agreement, dated as of June 30, 2005 (as amended, modified and

supplemented, the "First Lien Credit Agreement" and, the facility evidenced thereby, the "First Lien Facility"), by and among BLB Management Services, the guarantors named therein, certain lenders and the First Lien Agent.  As of the Petition Date, the total principal amount outstanding under the First Lien Facility is approximately $415 million.  The First Lien Facility is secured by first priority liens on and security interests in substantially all of the Debtors' assets.  The First Lien Facility was amended and restated on each of July 18, 2005, August 11, 2005, and August 23, 2005, and further amended on August 22, 2006.

In addition, the First Lien Credit Agreement required the Debtors to enter into certain interest rate hedging agreements.  The obligations under these hedging agreements are secured on a ratable and equal basis by the same collateral that secures the obligations under the First Lien Facility.  These hedging agreements have since been terminated, resulting in a secured obligation in the amount of approximately $27.6 million.

<u>The Second Lien Facility</u>

The Debtors' second lien debt is comprised of a $145 million second priority term loan due July 18, 2012, issued pursuant to that certain Second Amended and Restated Credit Agreement, dated as of July 18, 2005 as amended, modified and supplemented, the "Second Lien Credit Agreement" and, the facility evidenced thereby, the "Second Lien Facility"), by and among BLB Management Services, the guarantors named therein, certain second lien lenders and the Second Lien Agent.  As of the Petition Date, the total principal amount outstanding under the Second Lien Credit Agreement is $145 million.

The Second Lien Facility is secured by second priority liens on and security interests in substantially all of the Debtors' assets.  The Second Lien Facility was amended and restated on each of August 11, 2005 and August 23, 2005, and further amended as of August 22, 2006.  The relative priorities between the liens securing obligations under the First Lien Facility and those securing obligations under the Second Lien Facility and the relative rights and obligations of the First Lien Lenders and the Second Lien Lenders are governed by that certain Second Amended and Restated Intercreditor Agreement, dated July 18, 2005.

<u>Contractors' Mechanic's Liens</u>

In 2007, the Debtors completed an approximately $220 million renovation, expansion and rebranding of the Twin River facility, a significantly higher sum than the originally-projected cost of $125 million.  As a consequence, the Debtors were unable to pay in full Dimeo and its subcontractors (collectively, the "Contractors") for their work on Twin River.  The Contractors individually filed suits against the Debtors seeking payment for the services provided to Twin River.  On November 21, 2008, the Debtors and the Contractors entered into an amended consent order (the "Amended Consent Order") in Rhode Island Superior Court consolidating the various actions.  Pursuant to the Amended Consent Order, the Debtors agreed to make a series of interim monthly payments to the Contractors, and the Contractors agreed to forebear from exercising any remedies against the Debtors.  The Amended Consent Order also provided that the Contractors have perfected and enforceable mechanic's liens in certain project property in the amount of approximately $5.7 million, which amount has subsequently been reduced by the Debtors' prepetition monthly payments to approximately $3.0 million.  Also pursuant to the Amended Consent Order, the Contractors acknowledge that their mechanic's liens effectively are third priority liens, which are subordinate to the liens and security interests securing each of the First Lien Facility and Second Lien Facility.

Dimeo has not conceded and has disputed a claim of priority on the part of the First Lien Lenders' and Second Lien Lenders' mortgages on the Project Property under the First Lien Amendment and the Second Lien Amendment.

**Events That Led to Bankruptcy**

<u>Business Factors</u>

As noted above, after acquiring Twin River in 2005, the Company committed over $220 million in capital improvements and the considerable expertise of the Sponsors and management team to upgrade Twin River to the standards of a world-class facility.  The Company grew Twin River to over 500,000 square feet, including more than

156,000 square feet of gaming space and 4,752 VLTs. The Company's operational initiatives succeeded in significantly increasing revenues at Twin River even as Twin River's primary competitors' revenues slipped, notwithstanding one of the most challenging economic environments in recent history. Notably, in 2007 and 2008, Twin River outpaced all of its regional competitors in year over year growth with gross revenue from VLTs of $375 million and $410 million, respectively, during which period there was a marked decline in consumer leisure spending, coupled with a severe downturn in the local economy that resulted in double-digit unemployment in the state of Rhode Island.

The Debtors' Rhode Island operations currently employ approximately 800 people, approximately 500 of whom are represented by local unions. In 2009, the Debtors are projected to pay to the State, in addition to other state taxes paid by Twin River, approximately $244 million from sharing revenues generated by Twin River's VLTs, making Twin River the third-largest source of revenue for the state of Rhode Island. Twin River has positioned itself to capture the local Providence, Rhode Island market, as well as to compete with the larger Connecticut casinos (Foxwoods Casino and Mohegan Sun Casino) for customers from the greater Boston and Worcester areas.

As successful as the Debtors' operations have been, their revenues cannot support the substantial demands imposed by the State tax rate and the Debtors' debt-service obligations. Currently, the State reimburses Twin River less than 28% of every dollar generated at Twin River (after winnings to customers have been paid). The approximately 28% received by Twin River is approximately one-third of that received by Twin River's competitors in neighboring Connecticut. As such, Twin River's remaining revenues are insufficient to fund the Debtors' operations and to service the interest payments on the approximately $560 million in secured debt. In addition, the current legislative framework requires greyhound racing at the facility, which imposes significant operational losses annually upon the Debtors.

Moreover, delays in the completion of the Twin River capital improvement projects caused, among other things, the Debtors to default under certain covenants of the First Lien Facility. Accordingly, beginning in March 2008, the Debtors entered into a series of forbearance agreements with their First and Second Lien Lenders to provide the parties with sufficient time to negotiate a consensual solution to the Debtors' concerns regarding their ability to pay debt service while also satisfying their obligations to the State and continuing to fund their operations. The first series of forbearance agreements expired at the end of August 2008. The Debtors and the First and Second Lien Lenders entered into another series of forbearance agreements in September 2008. The Debtors' agreement with the Second Lien Lenders expired in November 2008 and the Debtors' agreement with First Lien Lenders expired in January 2009. Since those dates, the Debtors have been in payment default under the Second Lien Facility and covenant default under the First Lien Facility, without further forbearance agreements in place.

<u>The Restructuring Agreement</u>

For almost 15 months prior to the Petition Date, the Debtors, the First Lien Agent and the Second Lien Agent were in negotiations, at times with the participation of the State, in an attempt to find a consensual path forward. During the many months' of negotiations, the Debtors continued to pay interest owed to the First Lien Lenders (even after the last forbearance agreement lapsed), in addition to the professionals' fees the Debtors paid to the counsel and advisors of the First and Second Lien Lenders and of the State.

These negotiations resulted in the Restructuring Agreement with over 50% of the First Lien Lenders, a substantial amount of the Second Lien Lenders, and the State, on the terms of a preliminary restructuring transaction (the "Restructuring") to eliminate approximately $290 million in debt. The Restructuring is conditioned on certain necessary legislative actions and amendment of the VLT Contract between the State's Division of Lotteries and UTGR, which include: (a) legislative approval of 24-hour, 7-days-a-week gaming; (b) elimination of the statutory requirement to maintain greyhound racing at Twin River unless otherwise agreed to by the First and Second Lien Lenders and the State; (c) maintenance of the existing tax structure through the term of the VLT Contract (as extended pursuant to the exercise of all extension options thereunder); (d) implementation of a program that would allow for the reimbursement of promotional credits capped at 4% of the prior year's net VLT income; (e) implementation of a new marketing/advertising reimbursement structure; (f) contribution of up to $1.4 million in new operator fees; and (g) the waiver of any (i) default of any material covenant, term, or condition of the VLT

Contract existing on or before the effective date of the Plan and (ii) conditions to any further extensions of the VLT Contract.

**The Commencement of the Chapter 11 Cases**

On June 23, 2009, the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Rhode Island seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code.

The Chapter 11 Cases are being jointly administered under the caption In re UTGR, Inc. d/b/a Twin River, et al., Case No. 09-12418 (ANV).  The Debtors continue to operate their businesses and manage Twin River as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

**Events During Bankruptcy**

First Day Relief

Through a careful review of their business operations and cash requirements, and following detailed preparations by management and their advisers, the Debtors entered bankruptcy with minimal impact on their day-to-day business operations.  To facilitate, among other things, noticing, claims-processing and voting-related matters, the Debtors requested that the Bankruptcy Court enter an order granting certain relief including authorization for the joint administration of the Chapter 11 Cases.

On the Petition Date, the Debtors also sought and obtained several orders authorizing them to pay various prepetition claims.  These orders were designed to ease the strain on the Debtors' relationships with employees, vendors, customers and taxing authorities as a consequence of the commencement of the Chapter 11 Cases.  Among other things, these orders authorized the Debtors to:  (a) honor customer obligations and continue customer programs; (b) maintain cash management systems; (c) use prepetition bank accounts, checks, and other business forms; (d) make tax payments to federal, local, and state taxing authorities; (e) prohibit utility companies from discontinuing services; (f) maintain prepetition insurance policies and enter into new insurance policies; and (g) pay certain prepetition employee wages and benefits.  In addition, the Debtors engaged in an extensive communication program with vendors and customers assuring them that the transition into bankruptcy would be smooth and with no discernible interruption in operations.

The Debtors have been funding their operations during the Chapter 11 Cases by using cash on hand and cash flow from operations, which the Debtors believe to be sufficient to meet projected cash needs, including the payment of normal operating costs and expenses, as they proceed with their financial restructuring.  Therefore, the Debtors have not sought debtor-in-possession financing.

On the Petition Date, the Debtors sought authority to use cash collateral of their secured creditors to permit, among other things, the orderly continuation of the operation of the Debtors' businesses and to satisfy their working capital and operational needs.  The final cash collateral order was entered by the Bankruptcy Court on November 18, 2009 and provides adequate protection to those secured creditors, including:  (a) adequate protection payments to the First Lien Agent; (b) a section 507(b) superpriority claim to the First Lien Lenders; (c) adequate protection liens to the First Lien Agent, Second Lien Agent, and those contractors with perfected and enforceable mechanic's liens; and (d) payment of reasonable professional fees to the First Lien Agent.

Retention of Restructuring and Other Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors retained, as of the Petition Date, with authorization from the Bankruptcy Court, the law firms of Kirkland & Ellis LLP and Winograd, Shine & Zacks, P.C. as their restructuring counsel. Additionally, pursuant to the Bankruptcy Court's approval, the Debtors retained Lazard Freres & Co. LLC ("Lazard") as investment banker and financial advisor, Zolfo Cooper, LLC ("Zolfo Cooper") as bankruptcy consultants and special financial advisors, and Donlin as Notice, Claims and Solicitation Agent.  The Debtors also

received authorization from the Bankruptcy Court to employ attorneys and other professionals to represent or assist them in a variety of situations arising in the ordinary course of the Debtors' business in matters unrelated to the Chapter 11 Cases, including the retention, subject to licensing, of John J. McLaughlin, a consultant, as provided for by the Restructuring Agreement.

In addition to paying the fees of their own advisors, the Debtors are required to pay fees incurred by various other constituencies and their respective advisors related to the Chapter 11 Cases. On June 30, 2009, the United States Trustee appointed the Creditors' Committee in the Chapter 11 Cases to represent the interests of all general unsecured creditors of the Debtors. Since the formation of the Creditors' Committee, the Debtors have kept the Creditors' Committee informed about the Debtors' business operations. Additionally, as appropriate, the Debtors have sought the concurrence of the Creditors' Committee in connection with certain actions and transactions taken by the Debtors outside of the ordinary course of business.

**Implementation of the Restructuring Agreement**

<u>Transition Agreement</u>

The Restructuring Agreement sets forth the terms of a preliminary restructuring that is expected to eliminate approximately $290 million in debt. The Restructuring Agreement required the First Lien Lenders and the Second Lien Lenders (together, the "Lenders") to conduct a marketing process to identify a new operator of Twin River. The Restructuring Agreement further provided that if there was no agreement regarding continuing the role of the Sponsors within an initial 60-day period after the Petition Date, the Sponsors would transition ownership to the Lenders or an entity or trust designated by the Lenders. As part of this transition, which was to conclude within an additional 60-day period unless extended by agreement, the Sponsors' designated directors and officers of the Debtors would resign and be replaced with designees acceptable to the Lenders. Concurrently with and as a condition of the resignations, BLB Investors and its affiliates, the Debtors, and the Lenders would execute standard mutual releases with the Sponsors, their investment affiliates, and officers and directors.

Within the initial 60-day period following the Petition Date, no agreement was reached regarding BLB Investors' continuing role with the Debtors. Accordingly, consistent with the terms of the Restructuring Agreement, the Sponsors, the Debtors, the First Lien Agent, and the State engaged in vigorous negotiations over the terms of a consensual transition agreement (the "Transition Agreement") to effect the transition provided for in the Restructuring. The Debtors subsequently filed a motion to approve the Transition Agreement; however, the Debtors adjourned the motion to resolve objections to the Transition Agreement filed by the United States Trustee and the Creditors' Committee. The Debtors, nonetheless, remain committed to obtaining approval of the Transition Agreement, or obtaining the relief provided for in the Transition Agreement through the Plan.

<u>RIGOA Contract Rejection</u>

As of the Petition Date, the Debtors had an executory contract with the Rhode Island Greyhound Owners Association, Inc. (the "RIGOA"), dated July 18, 2005 and amended September 8, 2008 (the "RIGOA Contract"), for the purpose of providing greyhounds for live dog racing. Conducting live racing caused the Debtors' estates to suffer significant losses, primarily due to the required guaranteed payment of $9 million per year to RIGOA in addition to operational losses of over approximately $1 million a year. Accordingly, one of the primary goals of the Debtors' restructuring effort was to reject the RIGOA Contract to pursue alternative, less costly means to satisfy the Rhode Island law requirement to conduct live dog racing (and ultimately to obtain requisite legislative change allowing the Debtors to discontinue live dog racing altogether).

On August 8, 2009, the Debtors filed a motion seeking authorization to reject the RIGOA Contract (the "Rejection Motion"), thereby initiating a heavily-contested litigation. After discovery, the RIGOA filed an objection to the Rejection Motion, to which the Debtors and the First Lien Agent responded. Throughout the litigation, the Debtors, the RIGOA, and the First Lien Agent were simultaneously engaged in extensive good-faith, arm's-length negotiations to attempt to resolve the Rejection Motion consensually. These efforts were successful and culminated in an amended settlement agreement that was approved by the Bankruptcy Court on November 18, 2009.

<u>Management Incentive Program</u>

Prepetition, the Debtors, working with their restructuring advisors and Lenders, developed a business plan that included quarterly earnings benchmarks designed to enhance the long-term viability of the Debtors' businesses. To incentivize the Debtors' senior management to achieve these benchmarks—and thereby maximize value for all stakeholders—the Debtors adopted a Management Incentive Plan to compensate certain key managers for exemplary performance. More specifically, the Management Incentive Plan provided that Twin River's most senior executives would receive a Long Term Incentive Performance Bonus of an amount ranging from 25% to 100% of their 2008 base salary, if (and only if) management achieved quarterly EBITDA benchmarks over an 18 month period. The Restructuring Agreement reaffirmed the Debtors' and Lenders' commitment to the management incentive plan on a postpetition basis. Further, pursuant to Lender input, the Management Incentive Plan was modified in early 2009 to delay payments under the Management Incentive Plan. The Debtors filed and subsequently withdrew a motion authorizing them to make payments under the Management Incentive Program. See Debtors' Motion for Entry of an Order Authorizing Debtors to (A) Make Payments Under Amended Management Incentive Plan and (B) Enter Into Employment Agreements, filed on September 9, 2009 [Docket No. 287]; Supplement to Debtors' Motion for Entry of an Order Authorizing Debtors to (A) Make Payments Under amended Management Incentive Plan and (B) enter Into Employment Agreements, filed on October 2, 2009 [Docket No. 334]; Debtors' Notice of Withdrawal of Motions, filed on October 6, 2009 [Docket No. 338]. The Debtors are instead seeking this authority through the Plan. Eight of the Debtors' senior managers are eligible participants under the Management Incentive Plan. All quarterly earning benchmarks are achieved. Accordingly, the total potential payment amount under the Management Incentive Plan is $1,263,771.

## Plan Overview

On December 15, 2009, the Debtors filed their Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. The Plan contemplates the Debtors will retain and operate Twin River in the ordinary course of its business after emerging from chapter 11. The most significant components of the Plan are as follows:

- The Debtors will retain and reorganize around Twin River;

- The First Lien Lenders will convert their first lien debt into (i) 100% of the New Common Stock or Newco Common Stock (if created) and (ii) a $300 million New Senior Secured Credit Facility, which shall be secured by a first lien on substantially all of the assets of the Reorganized Debtors and issued pursuant to a new credit agreement; and

- For a period of seven (7) years following the effective date, the holders of Second Lien Facility Claims, in the event of a sale or recapitalization of the Reorganized Debtors (such event, a "Transaction") shall be entitled to (i) 50% of the amount of Transaction proceeds between $475 million and $575 million, and (ii) 75% of the amount of Transaction proceeds exceeding $575 million.

In addition, as contemplated by the Restructuring Agreement, the Plan provides that a condition precedent to the Plan becoming effective and the Debtors exiting bankruptcy is the passage of certain legislation by the Rhode Island General Assembly to enhance the Debtors' financial viability, including:

- Extension in operating hours at Twin River to 24 hours a day, 7 days a week;

- Elimination of the legislative requirement that the Debtors must conduct live dog racing to maintain their VLT license;

- Maintenance of the existing tax rate structure;

- Implementation of a program that would allow for the reimbursement of promotional credits capped at 4% of the prior year's net VLT income;

- Implementation of a new marketing/advertising reimbursement structure that would result in a sharing of certain costs among some constituencies that receive a portion of Twin River's gross VLT revenues;

- Contribution of up to $1.4 million in new operator fees; and

- Modification and waiver of various other provisions in the VLT Contract. More specifically, the VLT contract shall be modified to incorporate the legislative initiatives stated immediately above. The revised VLT Contract shall also provide for the waiver of Sections 2.5(B) of the VLT Contract (the only presently known potential default), as well as any other potential defaults that could preclude the Debtors' emergence from chapter 11. Section 2.5(B) states that UTGR shall certify to the Division of Lotteries of the Rhode Island Department of Administration that there are 1,300 full-time equivalent employees at Twin River on the date that UTGR exercises its option to extend the term of the VLT Contract and that there had been on average 1,300 full-time equivalent employees for the one-year period preceding the date the option is exercised, as confirmed by the Rhode Island Department of Labor and Training. The Debtors will not be able to make this certification on April 19, 2010, the date by which they need to exercise their option to extend the VLT Contract for a second 5-year term.

### Treatment of Claims Against and Equity Interests in the Debtors

**Administrative and Priority Claims**

### Administrative Expense Claims

Except with respect to administrative expense claims that are professional compensation and reimbursement claims and except to the extent that a holder of an allowed administrative expense claim and the applicable Debtors agree to less favorable treatment to such holder, each holder of an allowed administrative expense claim shall be paid in full in cash on the later of the distribution date under the Plan, the date such administrative expense claim is allowed, and the date such allowed administrative expense claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that allowed administrative expense claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

### Professional Compensation and Reimbursement Claims

Except as provided in Article II.A of the Plan, all entities seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the confirmation date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) file, on or before the date that is ninety (90) days after the effective date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in cash, in such amounts as are allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such administrative expense claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the confirmation date in the ordinary course and without the need for Bankruptcy Court approval.

### Priority Tax Claims

Each holder of an allowed priority tax claim shall receive, on the distribution date or such later date as such allowed priority tax claim becomes due and payable, at the option of the Debtors, one of the following treatments on account of such claim: (1) cash in an amount equal to the amount of such allowed priority tax claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; (2) such other treatment as may be agreed to by such holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court; or (3) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**Classification and Treatment of Classified Claims and Interests**

The categories of claims and interests listed below classify claims and interests for all purposes, including voting, confirmation and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a claim or interest to be classified in a particular class only to the extent that the claim or interest qualifies within the description of that class and will be deemed classified in a different class to the extent that any remainder of such claim or equity interest qualifies within the description of such different class.  A claim or an interest is in a particular class only to the extent that any such claim or interest is allowed in that class and has not been paid or otherwise settled prior to the effective date.

Pursuant to the terms of the Plan, except for claims that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code, or (b) specifically identified as being reinstated, all claims that arose prior to the confirmation of the Plan will be discharged.

To the extent a class contains allowed claims or interests with respect to a particular Debtor, the treatment provided to each class for distribution purposes is specified below.

A.    **BLB Worldwide Holdings**

1.    **Class A-1:  First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims against BLB Worldwide Holdings**

(a)    Classification.  Class A-1 consists of all First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims against BLB Worldwide Holdings.

(b)    Impairment and Voting.  Class A-1 is Impaired by the Plan.  Each Holder of an Allowed First Lien Facility Guarantee Claim and/or Allowed Swap Agreements Guarantee Claim against BLB Worldwide Holdings is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed First Lien Facility Guarantee Claim and/or Allowed Swap Agreements Guarantee Claim against BLB Worldwide Holdings shall receive on the Distribution Date its Pro Rata share of (i) the New Common Stock or Newco Common Stock (if created) and (ii) the New Senior Secured Credit Facility, which consideration shall be distributed as set forth in Class B-1.

To clarify, Holders of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims are only receiving distributions under the Plan for their First Lien Facility Claims and Swap Agreements Claims.

(d)    Estimated Allowed Amount of Claims: $442,423,310

(e)    Projected Percentage Recovery: 89%

2.    **Class A-2:  Second Lien Facility Guarantee Claims against BLB Worldwide Holdings**

(a)    Classification.  Class A-2 consists of all Second Lien Facility Guarantee Claims against BLB Worldwide Holdings.

(b)    Impairment and Voting.  Class A-2 is Impaired by the Plan.  Each Holder of an Allowed Second Lien Facility Guarantee Claim against BLB Worldwide Holdings is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Each Holder of an Allowed Second Lien Facility Guarantee Claim against BLB Worldwide Holdings shall receive on the Distribution Date its Pro Rata share of the Second Lien Facility Claim Contingent Value Right, which consideration shall be distributed as set forth in Class B-2.

To clarify, Holders of Second Lien Facility Guarantee Claims are only receiving distributions under the Plan for their Second Lien Facility Claims.

        (d)    <u>Estimated Allowed Amount of Claims</u>: $155,156,000

        (e)    <u>Projected Percentage Recovery</u>: N/A

    3.    **Class A-3:  Priority Non-Tax Claims**

        (a)    <u>Classification</u>.  Class A-3 consists of all Priority Non-Tax Claims that may exist against BLB Worldwide Holdings.

        (b)    <u>Impairment and Voting</u>.  Class A-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against BLB Worldwide Holdings is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

        (c)    <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against BLB Worldwide Holdings shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

        (d)    <u>Estimated Allowed Amount of Claims</u>: $0

        (e)    <u>Projected Percentage Recovery</u>: 100%

    4.    **Class A-4:  Secured Claims**

        (a)    <u>Classification</u>.  Class A-4 consists of all Secured Claims that may exist against BLB Worldwide Holdings.

        (b)    <u>Impairment and Voting</u>.  Class A-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against BLB Worldwide Holdings is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

        (c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against BLB Worldwide Holdings and the Debtors agree to less favorable treatment to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim against BLB Worldwide Holdings shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

        (d)    <u>Estimated Allowed Amount of Claims</u>: $0

        (e)    <u>Projected Percentage Recovery</u>: 100%

    5.    **Class A-5:  General Unsecured Claims and Rejection Damages Claims**

        (a)    <u>Classification</u>.  Class A-5 consists of all General Unsecured Claims and/or Rejection Damages Claims that may exist against BLB Worldwide Holdings.

        (b)    <u>Impairment and Voting</u>.  Class A-5 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim and/or Allowed Rejection Damages Claim against BLB Worldwide Holdings is entitled to vote to accept or reject the Plan.

        (c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Allowed Rejection Damages Claim against BLB Worldwide Holdings and the Debtors agree to less

favorable treatment to such Holder, each Holder of an Allowed General Unsecured Claim and/or Allowed Rejection Damages Claim against BLB Worldwide Holdings shall be paid an amount equal to 65% of its Allowed General Unsecured Claim and/or Allowed Rejection Damages Claim in Cash on the Distribution Date or as soon thereafter as is practicable.

        (d)    <u>Estimated Allowed Amount of Claims</u>:  $0

        (e)    <u>Projected Percentage Recovery</u>:  65%

    6.    **Class A-6:  Intercompany Claims**

        (a)    <u>Classification</u>.  Class A-6 consists of all Intercompany Claims that may exist against BLB Worldwide Holdings.

        (b)    <u>Impairment and Voting</u>.  Class A-6 is Unimpaired by the Plan.  Each Holder of an Allowed Intercompany Claim against BLB Worldwide Holdings is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

        (c)    <u>Distributions</u>.  At the Debtors' or Reorganized Debtors' option, and except as otherwise provided in the Plan, Allowed Intercompany Claims against BLB Worldwide Holdings shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or receive no distribution on account of such Claims.

        (d)    <u>Estimated Allowed Amount of Claims</u>:  $0

        (e)    <u>Projected Percentage Recovery</u>:  100%

    7.    **Class A-7:  Interests**

        (a)    <u>Classification</u>.  Class A-7 consists of all Interests in BLB Worldwide Holdings.

        (b)    <u>Impairment and Voting</u>.  Class A-7 is Impaired by the Plan.  Each Holder of an Interest in BLB Worldwide Holdings is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

        (c)    <u>Distributions</u>.  Interests in BLB Worldwide Holdings shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

        (d)    <u>Estimated Allowed Amount of Claims</u>:  $0

        (e)    <u>Projected Percentage Recovery</u>:  0%

**B.**    <u>**BLB Management Services**</u>

    1.    **Class B-1:  First Lien Facility Claims and Swap Agreements Claims against BLB Management Services**

        (a)    <u>Classification</u>.  Class B-1 consists of all First Lien Facility Claims and Swap Agreements Claims against BLB Management Services.

        (b)    <u>Impairment and Voting</u>.  Class B-1 is Impaired by the Plan.  Each Holder of an Allowed First Lien Facility Claim and/or Allowed Swap Agreements Claim against BLB Management Services is entitled to vote to accept or reject the Plan.

(c)        <u>Distributions</u>.  Each Holder of an Allowed First Lien Facility Claim and/or Allowed Swap Agreements Claim against BLB Management Services shall receive on the Distribution Date its Pro Rata share of (i) the New Common Stock or Newco Common Stock (if created) and (ii) the New Senior Secured Credit Facility.

(d)        <u>Estimated Allowed Amount of Claims</u>:  $442,423,310

(e)        <u>Projected Percentage Recovery</u>:  89%

2.        **Class B-2:  Second Lien Facility Claims against BLB Management Services**

(a)        <u>Classification</u>.  Class B-2 consists of all Second Lien Facility Claims.

(b)        <u>Impairment and Voting</u>.  Class B-2 is Impaired by the Plan.  Each Holder of an Allowed Second Lien Facility Claim is entitled to vote to accept or reject the Plan.

(c)        <u>Distributions</u>.  Each Holder of an Allowed Second Lien Facility Claim shall receive on the Distribution Date its Pro Rata share of the Second Lien Facility Claim Contingent Value Right.

Pursuant to the Intercreditor Agreement, the Second Lien Lenders are entitled to recover on account of their Second Lien Facility Claims only after the First Lien Lenders have received full satisfaction of all obligations due and owing to them under the First Lien Facility.  The distributions to the First Lien Lenders from Class B-1 do not fully satisfy all obligations due and owing to the First Lien Lenders under the First Lien Facility.  Notwithstanding the foregoing, the First Lien Lenders have agreed to waive their rights under the Intercreditor Agreement with respect to the distribution of the Second Lien Facility Claim Contingent Value Right to Holders of Second Lien Facility Claims.

(d)        <u>Estimated Allowed Amount of Claims</u>:  $155,156,000

(e)        <u>Projected Percentage Recovery</u>:  N/A

3.        **Class B-3:  Priority Non-Tax Claims**

(a)        <u>Classification</u>.  Class B-3 consists of all Priority Non-Tax Claims that may exist against BLB Management Services.

(b)        <u>Impairment and Voting</u>.  Class B-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against BLB Management Services is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)        <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against BLB Management Services shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)        <u>Estimated Allowed Amount of Claims</u>:  $0

(e)        <u>Projected Percentage Recovery</u>:  100%

4.        **Class B-4:  Secured Claims**

(a)        <u>Classification</u>.  Class B-4 consists of all Secured Claims that may exist against BLB Management Services.

(b)        <u>Impairment and Voting</u>.  Class B-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against BLB Management Services is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against BLB Management Services and the Debtors agree to less favorable treatment to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim against BLB Management Services shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $0

(e)    <u>Projected Percentage Recovery</u>:  100%

5.    **Class B-5:  General Unsecured Claims and Rejection Damages Claims**

(a)    <u>Classification</u>.  Class B-5 consists of all General Unsecured Claims and/or Rejection Damages Claims that may exist against BLB Management Services.

(b)    <u>Impairment and Voting</u>.  Class B-5 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim and/or an Allowed Rejection Damages Claim against BLB Management Services is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim and/or Allowed Rejection Damages Claim against BLB Management Services and the Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed General Unsecured Claim and/or Allowed Rejection Damages Claim against BLB Management Services shall be paid an amount equal to 65% of their Allowed General Unsecured Claim and/or Allowed Rejection Damages Claim in Cash on the Distribution Date or as soon thereafter as is practicable.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $0

(e)    <u>Projected Percentage Recovery</u>:  65%

6.    **Class B-6: Intercompany Claims**

(a)    <u>Classification</u>.  Class B-6 consists of all Intercompany Claims that may exist against BLB Management Services.

(b)    <u>Impairment and Voting</u>.   Class B-6 is Unimpaired by the Plan.  Each Holder of an Allowed Intercompany Claim against BLB Management Services is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  At the Debtors' or Reorganized Debtors' option, and except as otherwise provided in the Plan, Allowed Intercompany Claims against BLB Management Services shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or receive no distribution on account of such Claims.

(d)    <u>Estimated Allowed Amount of Claims</u>:  $1,609,000

(e)    <u>Projected Percentage Recovery</u>:  100%

7.    **Class B-7:  Intercompany Interests**

(a)    <u>Classification</u>.   Class B-7 consists of all Intercompany Interests in BLB Management Services.

(b)    <u>Impairment and Voting</u>.  Class B-7 is Unimpaired by the Plan.  Each Holder of an Intercompany Interest in BLB Management Services is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Interests in BLB Management Services shall be reinstated in exchange for the Reorganized Debtors' agreement to make certain distributions to the Holders of Allowed General Unsecured Claims and Rejection Damages Claims against BLB Management Services, to provide management services to other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors.

(d)    <u>Estimated Allowed Amount of Claims</u>: N/A

(e)    <u>Projected Percentage Recovery</u>: 100%

## C.    <u>UTGR</u>

1.    **Class C-1:  First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims against UTGR**

(a)    <u>Classification</u>.  Class C-1 consists of all First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims against UTGR.

(b)    <u>Impairment and Voting</u>.  Class C-1 is Impaired by the Plan.  Each Holder of an Allowed First Lien Facility Guarantee Claim and/or Allowed Swap Agreements Guarantee Claim against UTGR is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed First Lien Facility Guarantee Claim and/or an Allowed Swap Agreements Guarantee Claim against UTGR shall receive on the Distribution Date its Pro Rata share of (i) the New Common Stock or Newco Common Stock (if created) and (ii) the New Senior Secured Credit Facility, which consideration shall be distributed as set forth in B-1.

To clarify, Holders of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims are only receiving distributions under the Plan for their First Lien Facility Claims and Swap Agreements Claims.

(d)    <u>Estimated Allowed Amount of Claims</u>: $442,423,310

(e)    <u>Projected Percentage Recovery</u>: 89%

2.    **Class C-2:  Second Lien Facility Guarantee Claims against UTGR**

(a)    <u>Classification</u>.  Class C-2 consists of all Second Lien Facility Guarantee Claims against UTGR.

(b)    <u>Impairment and Voting</u>.  Class C-2 is Impaired by the Plan.  Each Holder of an Allowed Second Lien Facility Guarantee Claim against UTGR is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed Second Lien Facility Claim against UTGR shall receive on the Distribution Date its Pro Rata share of the Second Lien Facility Claim Contingent Value Right, which consideration shall be distributed as set forth in Class B-2.

To clarify, Holders of Second Lien Facility Guarantee Claims are only receiving distributions under the Plan for their Second Lien Facility Claims.

(d)    <u>Estimated Allowed Amount of Claims</u>: $155,156,000

       (e)       <u>Projected Percentage Recovery</u>:  N/A

3.     **Class C-3:  Priority Non-Tax Claims**

       (a)       <u>Classification</u>.  Class C-3 consists of all Priority Non-Tax Claims that may exist against UTGR.

       (b)       <u>Impairment and Voting</u>.  Class C-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against UTGR is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

       (c)       <u>Distributions</u>.  Each Holder of an Allowed Priority Non-Tax Claim against UTGR shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

       (d)       <u>Estimated Allowed Amount of Claims</u>:  $0

       (e)       <u>Projected Percentage Recovery</u>:  100%

4.     **Class C-4:  Secured Claims**

       (a)       <u>Classification</u>.  Class C-4 consists of all Secured Claims that may exist against UTGR.

       (b)       <u>Impairment and Voting</u>.  Class C-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against UTGR is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

       (c)       <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against UTGR and the Debtors agree to less favorable treatment to such Holder, on the Distribution Date or as soon thereafter as is reasonably practicable, each Allowed Secured Claim against UTGR shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.

       (d)       <u>Estimated Allowed Amount of Claims</u>:  $0

       (e)       <u>Projected Percentage Recovery</u>:  100%

5.     **Class C-5:  General Unsecured Claims, the RIGOA Claim, the Dimeo Claim, and Rejection Damages Claims**

       (a)       <u>Classification</u>.  Class C-5 consists of all General Unsecured Claims, the RIGOA Claim, the Dimeo Claim, and/or Rejection Damages Claims that may exist against UTGR (each, a "<u>Class C-5 Claim</u>").

       (b)       <u>Impairment and Voting</u>.  Class C-5 is Impaired by the Plan.  Each Holder of an Allowed Class C-5 Claim against UTGR is entitled to vote to accept or reject the Plan.

       (c)       <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Class C-5 Claim against UTGR and the Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Class C-5 Claim against UTGR shall be paid an amount equal to 65% of its Allowed Class C-5 Claim in Cash on the Distribution Date or as soon thereafter as is practicable.

       (d)       <u>Convenience Claim Election Rights</u>.  Each Holder of an Allowed Class C-5 Claim may elect to be treated as a Holder of a Convenience Claim in Class C-6 by electing to reduce its Class C-5 Claim to the amount of $2,500 in full and final satisfaction, release, and discharge of such Allowed Class C-5 Claim.  Any election must be made on the Ballot, and except as may be agreed to by the Debtors or the Reorganized Debtors, no

Holder of a Class C-5 Claim can elect the treatment as a Convenience Claim after the Voting Deadline. Upon any such valid election, the Class C-5 Claim of such Holder shall be automatically reduced to $2,500 and shall no longer be entitled to any other distribution as contemplated by this Plan.

      (e)      <u>Estimated Allowed Amount of Claims</u>:  $8,517,547[6]

      (f)      <u>Projected Percentage Recovery</u>:  65%

**6.**    **Class C-6:  Convenience Claims**

      (a)      <u>Classification</u>.  Class C-6 consists of all Convenience Claims that may exist against UTGR.

      (b)      <u>Impairment and Voting</u>.  Class C-6 is Impaired by the Plan.  Each Holder of a Convenience Claim against UTGR is entitled to vote to accept or reject the Plan.

      (c)      <u>Distributions</u>.  Each Holder of a Convenience Claim against UTGR shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

      (d)      <u>Estimated Allowed Amount of Claims</u>:  $986,707

      (e)      <u>Projected Percentage Recovery</u>:  up to 100%

**7.**    **Class C-7:  Intercompany Claims**

      (a)      <u>Classification</u>.  Class C-7 consists of all Intercompany Claims that may exist against UTGR.

      (b)      <u>Impairment and Voting</u>.  Class C-7 is Unimpaired by the Plan.  Each Holder of an Allowed Intercompany Claim against UTGR is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

      (c)      <u>Distributions</u>.  At the Debtors' or Reorganized Debtors' option, and except as otherwise provided in the Plan, Allowed Intercompany Claims against UTGR shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or receive no distribution on account of such Claims.

      (d)      <u>Estimated Allowed Amount of Claims</u>:  $9,377,000

      (e)      <u>Projected Percentage Recovery</u>:  100%

---

[6]    For the purpose of clarity, Class C-5 consists of:

- The RIGOA Claim, which, pursuant to the RIGOA Settlement, entitles RIGOA to an Allowed General Unsecured Claim against UTGR in an amount that results in a Plan distribution of $3,000,000 (conditioned upon the satisfaction of certain conditions precedent).  Because each Holder of an Allowed Class C-5 Claim against UTGR shall be paid an amount equal to 65% of its Allowed Class C-5 Claim, the RIGOA Claim is Allowed in the amount of $4,615,385.

- The Dimeo Claim in the estimated amount of $2,940,455, subject to resolution through the claims reconciliation process (Dimeo's filed proof of claim being in the amount of $3,584,086.63).

- Other general unsecured claims (that are presumed not to elect to be treated as a Holder of a Convenience Claim in Class C-6) in the amount of $961,707.

8.        **Class C-8: Intercompany Interests**

(a)        <u>Classification</u>.  Class C-8 consists of all Intercompany Interests in UTGR.

(b)        <u>Impairment and Voting</u>.  Class C-8 is Unimpaired by the Plan.  Each Holder of an Intercompany Interest in UTGR is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)        <u>Distributions</u>.  Interests in UTGR shall be reinstated in exchange for the Reorganized Debtors agreement to make certain distributions to the Holders of Allowed General Unsecured Claims and Rejection Damages Claims against UTGR, to provide management services to other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors.

(d)        <u>Estimated Allowed Amount of Claims</u>:  N/A

(e)        <u>Projected Percentage Recovery</u>:  100%

### Management of the Company

Biographical information for Mr. George Papanier, Mr. Craig Eaton, Mr. Craig Sculos, and Mr. Jay Minas is set forth below:

**George Papanier.**  Mr. Papanier is the President and Chief Operating Officer of the Company.  He has been associated with the Company since 2004.  He was Chief Operating Officer for Peninsula Gaming, a gaming company with properties in Iowa and Louisiana, from 2000 to 2004.  From 1997 to 2000, he served as Chief Operating Officer of Resorts Casino Hotel in Atlantic City, New Jersey.  From 1995 to 1996 he served as Chief Financial Officer at the Mohegan Sun Casino.

**Craig Eaton.**  Mr. Eaton is the Senior Vice President, General Counsel and Secretary of the Company.  He has been associated with the Company since 2005, and has almost 20 years of legal, regulatory and business experience.  Mr. Eaton was a partner at the law firm of Adler, Pollock & Sheehan, chairing its regulatory and compliance practice group from 1998 to 2004.  From 1995 to 1998, Mr. Eaton was General Counsel to the Narragansett Electric Company.

**Craig Sculos.**  Mr. Sculos is the Vice President and General Manager for Twin River/UTGR, a position he has held since BLB purchased the facility in 2005.  From 1996 to 2005, Mr. Sculos served in a variety of executive positions, including Assistant General to General Manager to President, of Lincoln Park.  Prior to his association with UTGR, he was Director of Communications for the Maryland Jockey Club from 1992 to 1996 and was employed in a similar capacity at The Westwood Racing Group from 1991 to 1992 and Suffolk Downs from 1986 to 1989.

**Jay Minas.**  Mr. Minas is the Chief Financial Officer. and Vice President of Finance for Twin River/UTGR. He has been with the Company since 2006.  He was Chief Financial Officer for several of Pinnacle Entertainment's gaming facilities from 2004 to 2006. Prior to that, he held increasingly senior positions in the gaming industry, including property Chief Financial Officer for Harrah's Entertainment.

The nature of compensation for the foregoing insiders will consist of base salary plus bonuses equal to 25% to 100% of their base salary.

### Composition of New Board of Directors

The Board of Directors of the Reorganized Debtors shall be comprised of Glenn A. Carlin, John J. McLaughlin, and John E. Taylor, Jr.  Biographical information for Messrs. Carlin, McLaughlin, and Taylor is set forth below:

**Glenn A. Carlin.**  Mr. Carlin is Senior Managing Director and Co-Head, Americas Investment Banking for CBRE Capital Advisors, Inc.  In addition, Mr. Carlin founded and has been a partner with GCET Capital Partners, LLC, a hospitality and gaming advisory firm since 2009.  From 1999 to 2009, he served as Managing Director and Head of Lodging and Gaming within the Real Estate & Lodging Investment Banking unit of JPMorgan Securities, Inc.  From 1999 to 1992, Mr. Carlin held other investment banking advisory positions with JPMorgan Securities (and its predecessor companies).  He is currently a director of FelCor Lodging Trust and sits on its Audit Committee.

**John J. McLaughlin.**  Since 2008, Mr. McLaughlin has been an independent gaming industry consultant. Apart from the period of April through August 2007, when he founded and was President of a gaming consulting firm, from 2001 to 2008, Mr. McLaughlin served as Chief Financial Officer, Chief Executive Officer of Gaming Operations, and President of Centaur, Inc., an Indianapolis-based gaming company.  From 1995 to 2001, he served as Co-Chief Executive Officer and Chief Financial Officer of Harvey's Casino Resorts in Lake Tahoe, Nevada.  Prior to 1995, Mr. McLaughlin held executive positions with Tropicana Hotel and Casino in Atlantic City, New Jersey and President Riverboat Casinos, Inc. in St. Louis, Missouri.  He is a licensed certified public accountant.

**John E. Taylor, Jr.**  Since 2006, Mr. Taylor has served as President, and in 2007 added the title of Chief Executive Officer of GameLogic Inc., located in Waltham, Massachusetts.  From 2000 to 2006, he served as Managing Director of SnowMark Corporation, an early stage venture capital firm based in Vero Beach, Florida.  From 1991 to 2000, Mr. Taylor served in various roles of increasing responsibility at GTECH Corporation, ultimately becoming the President and Chief Executive of Officer of Dreamport, Inc, a wholly owned subsidiary of the GTECH Corporation, while simultaneously serving as a Vice President of GTECH Holdings Corporation.  Prior to 1991, he served as a Special Assistant to the Governor of Rhode Island, a senior staff position.

### The Debtors' Business Upon Emergence

The Reorganized Debtors will principally be engaged in the continued ownership and operation of Twin River, a gaming facility located in Lincoln, Rhode Island.  Today, Twin River is a leading gaming facility in New England, offering 4,752 VLTs, virtual blackjack and roulette tables, and live greyhound racing.

The financial results described below are based primarily upon an analysis by the Debtors' financial advisors of the ongoing operations of Twin River, which accounts for the vast majority of value of the Debtors.  The valuation conclusions contained below are based upon management projections provided to the Debtors' financial advisors as of December 2009 and are highly dependent upon the Reorganized Debtors' ability to meet those projections.  Other key assumptions utilized by the Debtors' financial advisors include:  (a) emergence of the Debtors from chapter 11 bankruptcy protection on September 30, 2010; (b) approval and subsequent implementation of the initiatives contemplated by the Restructuring Agreement and Plan; (c) any defaults under the Debtors' existing gaming and/or operating licenses are waived without negative consequences and upon maturity of any such licenses the Debtors are able to renew them or enter into new agreements at terms substantially similar to existing terms; and (d) continued ownership and operation of gaming machines by third-party vendors.

**The Reorganized Debtors' Capitalization Upon Consummation of the Plan**

The following table sets forth both BLB Worldwide Holdings and its consolidated subsidiaries' cash and cash equivalents and capitalization (i) on an actual basis as of September 30, 2010 and (ii) on an as-adjusted basis as of October 1, 2010 to reflect the consummation of the Plan.

This table should be read together with the more detailed information contained elsewhere in this Disclosure Statement, including "Treatment of Claims Against and Equity Interests in the Debtors," beginning on page 20.

|  | As of September 30, 2010 | As of October 1, 2010 Emergence |
|---|---|---|
|  | (in millions) | |

**BALANCE SHEET**

| | As of September 30, 2010 | | As of October 1, 2010 Emergence | |
|---|---|---|---|---|
| | | (in millions) | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents.................................................. | $ | 40.823 | $ | 34.660 |
| Bankroll .......................................................................... | | 18.164 | | 18.164 |
| Restricted cash ................................................................ | | 1.097 | | 1.097 |
| Accounts receivable ......................................................... | | 6.830 | | 6.830 |
| Due from related parties................................................... | | 0.227 | | 0.227 |
| Inventory ......................................................................... | | 0.606 | | 0.606 |
| Deferred tax asset ........................................................... | | 0.613 | | — |
| Assets held for sale ......................................................... | | 17.066 | | 17.066 |
| Prepaid expenses and other assets.................................... | | 5.218 | | 2.917 |
| **Total current assets.................................................** | $ | 90.644 | $ | 81.566 |
| Property and equipment, net.............................................. | | 232.111 | | 232.111 |
| Reorganization in excess of identifiable assets ................... | | — | | 80.606 |
| Intangible assets, net ....................................................... | | 56.812 | | 56.812 |
| Deferred tax asset ........................................................... | | — | | — |
| **Total assets .............................................................** | $ | 379.567 | $ | 451.096 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | | | |
| Short term loan | | | | |
| Short term loan................................................................ | $ | 4.458 | $ | 4.458 |
| Current liabilities: | | | | |
| Accounts payable ............................................................ | | 6.738 | | 6.738 |
| Capital creditors .............................................................. | | — | | — |
| Accrued liabilities ........................................................... | | 13.575 | | 12.279 |
| Accrued interest .............................................................. | | 3.292 | | — |
| Due to BLB Investors L.L.C. from MH USA, net ............. | | 2.339 | | 2.339 |
| Current portion of deferred income taxes ......................... | | — | | — |
| **Total current liabilities.............................................** | $ | 30.403 | $ | 25.815 |
| Liabilities subject to compromise: | | | | |
| Term loans and revolving credit facility ............................ | | | | |
| First lien loan .................................................................. | | 289.088 | | — |
| Second lien loan............................................................... | | 145.0 | | — |
| Revolving credit facility ................................................... | | 125.690 | | — |
| Interest rate derivative..................................................... | | 27.645 | | — |
| Accounts payable ............................................................ | | 1.239 | | — |
| Capital creditors .............................................................. | | 3.045 | | — |
| Accrued liabilities ........................................................... | | 5.920 | | 0.222 |
| Accrued interest .............................................................. | | 10.156 | | — |
| **Total liabilities subject to compromise...................** | $ | 607.783 | $ | .222 |
| Term loan ........................................................................ | | — | | 300.0 |
| Accrued income taxes ...................................................... | | (0.004) | | 0.001 |
| Interest rate derivatives ................................................... | | — | | — |
| Deferred income taxes, net............................................... | | 8.375 | | 30.057 |
| **Total liabilities........................................................** | $ | 646.556 | $ | 356.095 |
| Stockholder's equity: | | | | |
| Additional paid-in capital................................................. | | 141.831 | | 95.0 |

31

| | As of September 30, 2010 | As of October 1, 2010 Emergence |
|---|---|---|
| | (in millions) | |
| Accumulated other comprehensive income | — | — |
| Retained earnings - prior year............................................ | (410.399) | — |
| Current year net income.................................................... | 1.579 | — |
| **Total stockholder's (deficit) equity**......................... | (266.989) | 95.0 |
| **Total liabilities and stockholder's equity** ............... | $    379.567 | $    451.096 |

**New Senior Secured Credit Facility**

The New Senior Secured Credit Facility will be comprised of a 5-year term loan of $300 million, with the terms as set forth in Exhibit 1 of the Restructuring Agreement (which Restructuring Agreement is attached as Exhibit 5 to the Plan Supplement).

Detailed terms of the New Senior Secured Credit Facility will be set forth in the new credit agreement in the form attached as Exhibit 4 to the Plan Supplement.

**Capital Obligations to be Satisfied or Compromised Upon Emergence**

As of the date the Debtors filed the Chapter 11 Cases, the Debtors reported, on a consolidated basis, approximately $560 million in aggregate long-term indebtedness, primarily consisting of the First Lien Facility and the Second Lien Facility. The Debtors plan to satisfy this indebtedness, as described in greater detail below.

<u>First Lien Facility</u>

The Debtors' first lien debt is comprised of a $420 million first priority credit facility, consisting of a $125 million revolving loan due July 18, 2010 and a $295 million term loan due July 18, 2011, issued pursuant to the First Lien Facility, by and among BLB Management Services, Inc., the guarantors named therein, certain lenders and the First Lien Agent. As of the Petition Date, the total principal amount outstanding under the First Lien Facility is approximately $415 million. The First Lien Facility is secured by first priority liens on and security interests in substantially all of the Debtors' assets. The First Lien Facility was amended and restated on each of July 18, 2005, August 11, 2005 and August 23, 2005, and further amended on August 22, 2006.

In addition, the First Lien Credit Agreement required the Debtors to enter into certain interest rate hedging agreements with affiliates of certain of the First Lien Lenders. The obligations under these hedging agreements are secured on a ratable and equal basis by the same collateral that secures the obligations under the First Lien Facility. These hedging agreements have since been terminated, resulting in a secured obligation in the amount of approximately $27.6 million.

<u>Second Lien Facility</u>

The Debtors' second lien debt is comprised of a $145 million second priority term loan due July 18, 2012, issued pursuant to the Second Lien Facility, by and among BLB Management Services, Inc., the guarantors named therein, certain Second Lien Lenders and the Second Lien Agent. As of the Petition Date, the total principal amount outstanding under the Second Lien Credit Agreement is $145 million.

The Second Lien Facility is secured by second priority liens on and security interests in substantially all of the Debtors' assets. The Second Lien Facility was amended and restated on each of August 11, 2005 and August 23, 2005, and further amended as of August 22, 2006. The relative priorities between the liens securing obligations under the First Lien Facility and those securing obligations under the Second Lien Facility and the relative rights and obligations of the First Lien Lenders and the Second Lien Lenders are governed by that certain Second Amended and Restated Intercreditor Agreement, dated July 18, 2005.

<u>The Dimeo Claim</u>

On November 21, 2008, the Debtors and certain Contractors that were not fully paid for their work on Twin River capital improvements entered into the Amended Consent Order in Rhode Island Superior Court.  Pursuant to the Amended Consent Order, the Debtors agreed to make a series of interim monthly payments to the Contractors, and the Contractors agreed to forebear from exercising any remedies against the Debtors.  As of the Petition Date, the total amount outstanding under the Amended Consent Order was approximately $3 million.  Also pursuant to the Amended Consent Order, the Contractors acknowledged that their mechanic's liens effectively were third priority liens, which are subordinate to the liens under the First Lien Facility and Second Lien Facility.

Dimeo has not conceded and has disputed a claim of priority on the part of the First Lien Lenders' and Second Lien Lenders' mortgages on the Project Property under the First Lien Amendment and the Second Lien Amendment.

<u>Trade Claims and Other Unsecured Obligations</u>

Prior to the date the Debtors filed the Chapter 11 Cases, the Company incurred debt with several creditors in the ordinary course of its business.  The claims related to these obligations are more fully described in the Plan, which is included as Exhibit A to this Disclosure Statement.  Pursuant to the Plan, the holders of general unsecured claims will receive an amount equal to 65% of their allowed general unsecured claim, or up to $2,500, in cash on the distribution date or as soon thereafter as is practicable.

## The Debtors' Capitalization After Emergence

Following its emergence from bankruptcy, BLB Worldwide Holdings or Newco (if created and if established as a corporation) expects to have 10,000 shares of New Common Stock outstanding.

## Description of Capital Stock

*The following is a description of the material terms of the capital stock of BLB Worldwide Holdings or Newco (if created and if established as a corporation).  This description also summarizes certain provisions of the Delaware General Corporation Law ("DGCL").*

**Authorized New Capital Stock**

BLB Worldwide Holdings or Newco (if created) will have the authority to issue capital stock in the form of 10,000 shares of New Common Stock or Newco Common Stock (if created), respectively, par value $0.001 per share.

<u>Voting Rights</u>

All shares of New Common Stock or Newco Common Stock (if created), will have identical rights and privileges as BLB Worldwide Holdings' prepetition capital stock.  Holders of shares of the New Common Stock or Newco Common Stock (if created), will be entitled to vote on all matters submitted to a vote of stockholders, including the election of directors.  On all matters to be voted on by holders of shares of New Common Stock or Newco Common Stock (if created), the holders will be entitled to one vote for each share of New Common Stock or Newco Common Stock (if created), held of record, and will have no cumulative voting rights.

<u>Dividend Rights</u>

Subject to limitations under Delaware law, preferences that may apply to any outstanding shares of preferred stock and contractual restrictions, holders of New Common Stock or Newco Common Stock (if created), are entitled to receive ratably dividends or other distributions when and if declared by the Board of Directors.  In addition to such restriction, whether any future dividends are paid to the holders of the New Common Stock or Newco Common Stock (if created), will depend on decisions that will be made by the Board of Directors and will

depend on then existing conditions, including the Reorganized Debtors' financial condition, contractual restrictions, corporate law restrictions, capital requirements and business prospects. The ability of the Board of Directors to declare dividends also will be subject to the rights of any holders of outstanding shares of any preferred stock of BLB Worldwide Holdings (if authorized) and the availability of sufficient funds under the DGCL to pay dividends.

### Transfer Agent and Registrar

The transfer agent and registrar for the New Common Stock or Newco Common Stock (if created), will be determined prior to the effective date of the Plan.

### Stock Option Program

The Board of Directors may reserve a portion of New Common Stock or Newco Common Stock (if created) for a stock option program to be administered by the Board of Directors. Should the Board of Directors seek to implement this program, it will serve as a form of discretionary incentive-based compensation for the employees, officers and directors of the Reorganized Debtors.

## Limitations on Liability and Indemnification of Directors and Officers

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties. The Amended and Restated Certificate of Incorporation limits the liability of directors to the fullest extent permitted by the DGCL. In addition, the Reorganized Company's bylaws provide that the Reorganized Company must indemnify its directors and officers to the fullest extent permitted by the DGCL. The Amended and Restated Certificate of Incorporation includes a provision that eliminates the personal liability of directors to the Reorganized Company or its stockholders for monetary damages for any breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL as the same exists or hereafter may be amended.

The limitation of liability and indemnification provisions in the Amended and Restated Certificate of Incorporation and the Reorganized Debtors' bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit the Debtors or the Reorganized Debtors and their stockholders. In addition, the Reorganized Debtors may be adversely affected to the extent they are obligated to pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

## Summary of Legal Proceedings

The Debtors are party to certain legal proceedings. Most of these legal proceedings have arisen in the ordinary course of the Debtors' business and involve claims for money damages. Whether these claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the claims and the debt arising therefrom. Generally, if the debt underlying such claims was incurred by one of the Debtors prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the claim is liquidated and resolved before or after the effective date. Claims arising from conduct occurring after the effective date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by UTGR in the ordinary course of its business after emergence.

## Legal Proceedings in the Bankruptcy Court

### Avoidance Actions

A number of transactions occurred prior to the Petition Date that may have given rise to claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action

under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance Actions").

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on June 23, 2011, *i.e.,* two years after the Petition Date. To date, the Debtors have not made a determination whether they have any Avoidance Actions to prosecute. See "Effect of Confirmation of the Plan," which begins on page 46 .

**Pending Legal Proceedings Outside the Bankruptcy Court**

Based on a review of their pending litigations and proceedings, the Debtors do not believe that they have any significant pending litigations or proceedings, but are instead party to ordinary routine litigations or proceedings incidental to their business. Significant litigation or proceedings are those that are material and out of the ordinary course of business and which involve a claim for damages in an amount that would exceed 10% of the Debtors' consolidated assets. The Debtors are not aware of any pending litigation or proceeding that would meet such a standard.

Due to the nature of the Debtors' business, they are frequently subject to various personal injury and property damage claims and suits brought by customers. With respect to each of these claims, the Debtors' maximum monetary exposure is their $25,000 insurance deductible. In addition, because approximately 80% of the Debtors' workforce is subject to certain collective bargaining agreements, relatively minor labor grievances and arbitrations are frequently filed by employees. At present, the majority of these proceedings involve monetary exposure of less than $30,000, and total approximately $180,000. However, the Debtors are confident that they will prevail in most proceedings. Of the pending actions against the Debtors, the largest claim asserted against the Debtors is <u>Michael Cardello v. UTGR, Inc. D/B/A Twin River</u>, AAA Case No. 11460039709. In this arbitration, a former executive of the Debtors alleges breach of his employment contract and demands approximately $350,000 in monetary damages. The Debtors consider this case frivolous and without merit and are opposing the claim.

For a detailed summary of the Debtors' pending litigations and proceedings, see the Debtors' Schedule of Liabilities and Statement of Financial Affairs, which were filed with the Bankruptcy Court on August 22, 2009 [Docket Nos. 246-51].

<strong>Projected Financial Information</strong>

Attached as Exhibit C are the following: (a) a consolidated projected income statement for the period from 2009 through 2014 (the "Projection Period"); (b) a consolidated projected balance sheet for the Projection Period; and (c) a consolidated projected statement of cash flow for the Projection Period.

The projections have been prepared by the Debtors' management with the assistance of the Debtors' retained financial advisors. Such projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants and the rules and regulations of the United States Securities and Exchange Commission. In assisting in the preparation, Zolfo Cooper and Lazard relied upon the accuracy and completeness of financial and other information furnished by the Debtors' management and third parties, as well as publicly-available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Debtors and third parties with respect to the anticipated future performance of the Reorganized Debtors. Zolfo Cooper and Lazard did not attempt independently to audit or verify such information. Neither the Debtors nor their financial advisors conducted an independent investigation into any of the legal, tax or accounting matters affecting the Debtors or the Reorganized Debtors and, therefore, neither makes any representation as to their impact on the Debtors or the Reorganized Debtors from a financial point of view. Further, the Debtors' independent accountants have neither examined nor compiled the accompanying actual results and projections and, accordingly, do not express an opinion or any other form of assurance with respect to the projections, assume no responsibility for the projections and disclaim any association with the projections. Except for purposes of this Disclosure Statement, the Debtors do not publish projections of their anticipated financial position or results of operations.

The projections contain certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are and will be beyond the control of the Reorganized Debtors, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, currency exchange rate fluctuations, existing and future governmental regulations and actions of government bodies, natural disasters and unusual weather conditions and other market and competitive conditions. Holders of claims are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Debtors and the Reorganized Debtors undertake no obligation to update any such statements.

The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are and will be beyond the Reorganized Debtors' control. The Debtors caution that no representations can be made or are made as to the accuracy of the historical financial information or the projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions may prove to be inaccurate. Moreover, events and circumstances occurring subsequent to the date on which these projections were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and the Reorganized Debtors do not intend and undertake no obligation to update or otherwise revise the projections to reflect events or circumstances existing or arising after the date this Disclosure Statement is initially filed or to reflect the occurrence of unanticipated events. The projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, holders of claims or interests must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections.

Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The projections have been prepared based on the assumptions that the effective date of the Plan is September 30, 2010 and the Reorganized Debtors' business plan is successfully implemented. Although the Debtors presently intend to cause the effective date to occur as soon as practicable following confirmation of the Plan, there can be no assurance as to when the effective date will actually occur given the conditions for the effective date to occur pursuant to the terms of the Plan.

The projections are based on, among other things: (a) current and projected market conditions of the Reorganized Debtors' market; (b) the ability to maintain sufficient working capital to fund operations; and (c) confirmation of the Plan.

### Risk Factors

*Holders of claims and interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, prior to voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

## Risks Relating to Bankruptcy

### The Debtors may not be able to obtain confirmation of the Plan.

To emerge successfully from the Chapter 11 Cases as a viable entity, the Debtors, like any debtor, must obtain approval of a plan of reorganization from their creditors, confirmation of the plan through the Bankruptcy

Court, and successfully implement this confirmed plan.  The foregoing process requires the Debtors to (a) meet statutory requirements with respect to the adequacy of disclosure with respect to any proposed plan, (b) solicit and obtain creditor acceptances of the proposed plan and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm a plan.  If the requisite acceptances of the Plan are received, the Debtors intend to seek confirmation of the Plan by the Bankruptcy Court.  If the requisite acceptances are not received, the Debtors may nevertheless seek confirmation of the Plan notwithstanding the dissent of certain classes of claims.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class of claims if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  In order to confirm a plan against a dissenting class, the Bankruptcy Court also must find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court may not confirm the Plan as proposed.  A dissenting holder of a claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code.  Finally, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm a proposed plan if it found that any of the statutory requirements for confirmation had not been met.  Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (b) confirmation of the debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization and (c) the value of distributions to non-accepting holders of claims within a particular class under the debtor's plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.  The Bankruptcy Court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions holders of claims against or holders of the Debtors' common stock or other equity interests ultimately would receive with respect to their claims or equity interests.  There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Cases that is acceptable to the Bankruptcy Court and the Debtors' creditors, equity holders and other parties in interest.  Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.  Finally, the Debtors' emergence from bankruptcy is not assured.  While the Debtors expect to emerge from bankruptcy in the future, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur.

<u>Loss of key management and employees.</u>

The Debtors' success is largely dependent on the skills, experience, and efforts of their people.  While the Debtors believe that they have excellent depth throughout all levels of management and in all key skill levels of their employees, the loss of the services of one or more members of the Debtors' senior management or of numerous employees with critical skills could have a negative effect on their business, financial condition and results of operations.  If the Debtors are not able to attract talented, committed individuals to fill vacant positions when needs arise, it may adversely affect their ability to fully implement their business objectives.

<u>Increases in costs could adversely affect the Debtors' operating results.</u>

The Debtors' inability to maintain their cost structure and efficiently operate Twin River may reduce their operating results.  In addition, increases in certain non-controllable or mandatory costs that are driven by external factors may reduce the Debtors' operating results.  Examples of these costs are energy, insurance and taxes.

The conditions precedent to the confirmation and consummation of the Plan may not occur.

As more fully set forth in Exhibit A, the occurrence of confirmation of the Plan and the effective date of the Plan are each subject to a number of conditions precedent.  If the conditions precedent to confirmation are not met or waived, the Plan will not be confirmed; and if the conditions precedent to the effective date are not met or waived, the effective date will not take place.

However, Article XII.C of the Plan provides, in relevant part, that "[i]f the effective date has not occurred within 180 days of confirmation, then upon motion by a party-in-interest made before effective date and a hearing, the confirmation order may be vacated by the Bankruptcy Court . . . ."  Furthermore, Article XII.B of the Plan provides that the Debtors "may waive any of the conditions to the effective date . . . ."  In other words, if all conditions precedent have not occurred within six months after confirmation, the Debtors may waive those conditions or the Debtors (or any other party-in-interest) can seek to vacate the confirmation order.

The Plan requires certain legislative action by the Rhode Island General Assembly, which may delay the Debtors' emergence from these Chapter 11 Cases.

As explained above, certain legislative actions must be undertaken by the Rhode Island General Assembly and approved by the State for the Plan to become effective.  While the Debtors are actively lobbying for the passage of such legislation, the Debtors can make no assurances as to if and when such legislation will be passed and signed into law.  Failure by the Rhode Island General Assembly and the State to pass the necessary legislation required by the Restructuring Agreement will delay and may even prevent the Debtors' emergence from Chapter 11.

The recovery for holders of the general unsecured claims against the Debtors may be diluted and the ultimate amount of allowed claims against the Debtors may not be finalized until after the effective date.

To date, 288 proofs of claim have been filed against the Debtors.  The asserted amount of such claims is approximately $1,777,638,277.09.  The Debtors have not yet completed their claims reconciliation process and therefore have not fully analyzed these filed proofs of claims.  Through the Debtors' claims reconciliation process, certain filed proofs of claims may be reduced or disallowed.  As a result, the claims reconciliation process may result in changes that could affect the recovery for holders of general unsecured claims under the Plan.

Parties in interest may object to the Debtors' classification of claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of claims and equity interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, the Bankruptcy Court may reach a different conclusion.

The Debtors may object to the amount or classification of a claim.

The Debtors reserve the right to object to the amount or classification of any claim.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of claim whose claim is subject to an objection.  Any such holder of a claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

The Debtors may not be able to achieve their projected financial results.

The financial projections set forth on Exhibit C to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations.  The Debtors' actual financial results may differ significantly from the projections.  If the Debtors do not achieve their projected financial results, the Debtors may lack the necessary capital to continue operating as planned after the effective date of the Plan.

The holders of First Lien Facility Claims will acquire all of the New Common Stock upon consummation of the Plan.

Holders of First Lien Facility Claims will receive all of the New Common Stock, and thus will be in a position to control the outcome of actions requiring stockholder approval, including, among other things, election of directors.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Debtors and, consequently, impact the value of the New Common Stock.

Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors.

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the effective date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

Certain tax consequences of the Debtors' Plan raise unsettled and complex legal issues and involve various factual determinations.

Some of the material consequences of the Plan regarding U.S. federal income taxes are summarized under "Certain U.S. Federal Income Tax Consequences of the Plan."  Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. No ruling from the U.S. Internal Revenue Service ("IRS") has been or will be sought by the Debtors regarding any of the tax consequences described in this Disclosure Statement.  The IRS may challenge the various positions the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection by the IRS.  For a more detailed discussion of risks relating to the specific positions the Debtors intend to take with respect to various tax issues, please review "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 53.

The restructuring will likely result in the elimination of all of the Debtors' net operating losses.

As further discussed in "Certain U.S. Federal Tax Consequences of the Plan," the restructuring will give rise to significant cancellation of debt income to the Debtors.  Although the Debtors will not be required to include such income in their gross taxable income, they will be required to reduce certain tax attributes, including net operating losses, as a result of the cancellation of debt income.  Accordingly, it is expected that the Debtors will not have any net operating losses available to them to offset taxable income in future years.  The elimination of such losses may cause the Debtors to  incur greater tax liability in future years.

The Reorganized Company's charter and bylaws could deter takeover attempts that some shareholder may consider desirable, which could adversely affect the value of the New Common Stock.

Various provisions of the Reorganized Company's Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws, and Delaware law, could make acquiring control of the Reorganized Company without the requisite support of its Board of Directors difficult for a third party, even if the change of control would be beneficial to a recipient of New Common Stock.  The existence of these provisions could deprive certain recipients of New Common Stock of an opportunity to sell their shares of New Common Stock at a premium over the prevailing market price.  The potential inability of holders of New Common Stock to obtain a control premium could, in certain instances, depress any future trading prices of New Common Stock.

The Debtors depend on generating (and having available to the applicable obligor) sufficient cash flow to fund their debt obligations, capital expenditures, and ongoing operations.  The Debtors access to additional financing may be limited, which could adversely affect the Debtors' financial condition and their ability to conduct their business.

The Debtors' ability to service their debt and to fund their planned capital expenditures and ongoing operations will depend on both their ability to generate and grow cash flow and their access (by dividend or otherwise) to additional liquidity sources.  The Debtors' ability to generate and grow cash flow is dependent on many factors, including:

- the Debtors' ability to sustain and grow revenues and cash flows from operating activities and to maintain and grow their customer base, particularly in the face of increasing competition;

- general business conditions, economic uncertainty or downturn, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the housing sector and overall economy;

- the effects of current and potential future competitors on the Debtors' business; and

- the effects of governmental regulation on the Debtors' business.

Some of these factors are beyond the Debtors' control.  It is also difficult to assess the impact that the general economic downturn and recent turmoil in the credit markets will have on future operations and financial results.  However, the general economic downturn has resulted in reduced spending by customers, which may have impacted the Debtors' revenues and cash flows from operating activities from those that otherwise would have been generated.  If the Debtors are unable to generate sufficient cash flow or are unable to access additional liquidity sources, they may not be able to service and repay their debt, operate their business, respond to competitive challenges, or fund other liquidity and capital needs.  It is uncertain whether the Debtors will be able, under applicable law, to make distributions or otherwise move cash to the relevant entities for payment of interest and principal.

Economic conditions, including a worsening of the current economy and other factors affecting discretionary consumer spending, may harm the Debtors' business, financial conditions, and results of operations.

The Debtors' businesses may be adversely affected by the recession currently being experienced in the United States since the Debtors are dependent on discretionary spending by their customers.  The continuation or worsening of current economic conditions could cause fewer people to spend money or cause people to spend less money at the Debtors' facility and could adversely affect the Debtors' revenues.

Intense competition could result in loss or market share or profitability.

The Debtors face intense competition in the market in which its gaming facility is located.  The Debtors' primary facility competes with other slots-only facilities, as well as major casino-hotels, primarily in Connecticut and Atlantic City, New Jersey.  Gaming continues to expand in the region, with new or expanded facilities expected in New York, Maryland, Massachusetts, Pennsylvania and Delaware.

Some of the Debtors' competitors have significantly greater financial resources and, as a result, the Debtors may be unable to compete successfully with them in the future.  In addition, online gaming, despite its current illegality in the United States, is a growing sector in the gaming industry.  Online casinos offer a variety of games, including slot machines, roulette, poker, and blackjack.  Such online casinos allow individuals to participate using credit or debit cards or other forms of electronic payment.  The Debtors are unable to assess the impact that online gaming will have on their business operations in the future and there is no assurance that the impact will not be materially adverse.

Competition from other casino and hotel operators involves not only the quality of casino, hotel room, restaurant, entertainment, and convention facilities, but also the pricing of such services. The Debtors' operating results may be adversely affected by significant cash outlays for advertising and promotions for complementary services to patrons. If the Debtors lack the financial resources or liquidity to match the promotions of competitors, the number of casino patrons may decline, adversely effecting the Debtors' financial performance.

The Debtors' ability to compete successfully will also depend on their ability to develop and implement effective marketing campaigns to attract customers to their facility. To the extent that they are unable to do so, the Debtors may not be able to successfully compete in their markets and their financial position could be adversely affected.

<u>Work stoppages, labor problems, and unexpected shutdowns may limit the Debtors' operational flexibility and negatively impact the Debtors' revenue.</u>

The Debtors are party to certain collective-bargaining agreements with labor unions. There can be no assurances that the Debtors will be able to renegotiate the labor agreements that are currently in effect without incurring significant increases in their labor costs. Changes to the collective-bargaining agreements could cause significant increases in labor costs, which could have a material adverse affect on the Debtors' businesses, financial conditions, and operations.

Moreover, the unions with which the Debtors have collective-bargaining agreements or other unions could seek to organize groups of employees that are not currently represented by a union. Union organization efforts may occur in the future, potentially causing disruptions to the Debtors' businesses and resulting in increased costs, both of which could have a material adverse affect on the Debtors' businesses, financial condition, and operations.

Lastly, if the Debtors are unable to negotiate new collective-bargaining agreements on mutually acceptable terms, aggrieved employees may engage in strikes or other forms of workplace disruptions, that could have a materially adverse effect on the Debtors' business and operations. Any unexpected work stoppage by the Debtors' employees could have an adverse effect on their businesses and operations, resulting in negative media attention and potentially discouraging customers from visiting the Debtors' facility. There cannot be assurance that the Debtors can be adequately prepared for unexpected labor developments that may lead to a temporary or permanent shutdown of their facility.

<u>The increased concentration of the VLT manufacturing industry could impose additional costs on the Debtors.</u>

The majority of the Debtors' revenue is attributable to VLTs operated by the Debtors at the Twin River facility. To be competitive, the Debtors must offer the most popular and technologically advanced VLT games to their customers. In recent years, the number of companies that manufacture VLTs has declined to a select group of manufacturers. A deterioration in the Debtors' commercial arrangements with the limited number of VLT manufacturers, would result in the Debtors being unable to obtain the VLTs and could result in significantly higher prices for these VLTs. Alternatively, significant industry demand for certain new VLTs may result in the Debtors being unable to obtain the desired number of new VLTs or result in increased costs for the limited number of new VLTs. An inability to obtain the newest and most up-to-date VLT games could impair the Debtors' competitive position and result in decreased gaming revenue at the Twin River facility.

### Confirmation of the Plan

#### The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the confirmation hearing for [   ], 2010 at [   ] a.m./p.m. (prevailing Eastern Time) before the Honorable Arthur N. Votolato, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Rhode Island, located at 380 Westminster Street, Providence, Rhode Island 02903. The confirmation hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the confirmation hearing or any adjournment thereof.

**Deadline to Object to Confirmation**

Objections to the Bankruptcy Court's confirmation of the Plan must be filed and served at or before [   ] a.m./p.m. (prevailing Eastern Time) on [   ], 2010 in accordance with the notice of the confirmation hearing that accompanies this Disclosure Statement. **Unless objections to confirmation are timely served and filed, they may not be considered by the Bankruptcy Court.**

**Requirements for Confirmation of the Plan**

Among the requirements for the confirmation of the Plan are that the Plan (1) is accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (2) is feasible, and (3) is in the "best interests" of holders of claims and equity interests that are impaired under the Plan.

At the confirmation hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of Chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with all of the necessary requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- Either each holder of an impaired claim has accepted the Plan, or will receive or retain under the Plan on account of such claim, property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for equity interests deemed to reject the Plan.

- Each class of claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular claim will agree to a different treatment of its claim, the Plan provides that administrative claims and priority tax claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

42

- At least one class of impaired claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in that class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the effective date.

**Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a Chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if each of the debtor's Chapter 11 Cases were converted to a Chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed and consummated.

To estimate what members of each impaired class of claims would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a Chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to holders of general unsecured claims or equity interests would be reduced by, among other things: (a) the claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases; (c) unpaid administrative expense claims of the Chapter 11 cases; and (d) priority claims and priority tax claims. The Debtors' costs of liquidation in Chapter 7 Cases would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, claims arising from the operation of the Debtors during the Chapter 7 Cases, and all unpaid administrative expense claims incurred by the Debtors during the Chapter 11 cases that are allowed in the Chapter 7 cases. The liquidation itself would trigger certain priority claims, such as claims for severance pay, and would likely accelerate the payment of other priority claims and priority tax claims that would otherwise be payable in the ordinary course of business. These priority claims and priority tax claims would be paid in full out of the net liquidation proceeds, after payment of secured claims, before the balance would be made available to pay other claims or to make any distribution in respect of equity interests.

Based on the Liquidation Analyses set forth in Exhibit E of this Disclosure Statement, the Debtors believe that holders of claims will receive equal or greater value as of the effective date under the Plan than such holders would receive in a Chapter 7 liquidation. In summary, the Debtors and their management believe that Chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by holders of general unsecured claims entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- the erosion of the value of the Debtors' assets in the context of an expedited going concern sale or asset-by-asset liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail;

- the increased cost and expenses of liquidation under Chapter 7 arising from fees payable to the Chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- additional expenses and claims, some of which would be entitled to priority and which would be generated during the liquidation and from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of the Debtors' operations;

- the adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors; and

- the application of the rule of absolute priority under the Bankruptcy Code to distributions made in a Chapter 7 liquidation.

Consequently, the Debtors and their management believe that confirmation of the Plan will provide a substantially greater return to holders of claims than would a Chapter 7 liquidation.

If the Plan is not confirmed and the Debtors fail to propose and confirm an alternative plan of reorganization, they may be liquidated pursuant to the provisions of a Chapter 11 liquidating plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in higher administrative costs. Because a trustee's appointment is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a Chapter 7 trustee must be appointed. Any distribution to holders of claims under a Chapter 11 liquidation plan probably would be delayed substantially. Most importantly, the Debtors believe that any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of their business, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that Chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the projections, as set forth on Exhibit C. Based upon the projections, the Debtors believe that the Debtors will be a viable operation following the Chapter 11 cases, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy

Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the Plan.

**No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property, subject to the applicability of the "new value" exception.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired class rejects the

Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank.  The Debtors believe that the Plan and the treatment of all classes of claims and equity interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

**New Value**

A corollary to the "fair and equitable" test, the new value doctrine, permits old equity holders to keep their ownership interests even though senior dissenting creditors do not receive payment in full of their claims provided that the old equity holders make a new contribution (a) in money or money's worth, (b) that is reasonably equivalent to the value of the new equity interests being received in the reorganized debtor, and (c) that is necessary for implementation of a feasible plan of reorganization.

**Valuation of the Debtors**

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Reorganized Debtors.  Accordingly, such valuation is set forth in Exhibit D attached hereto.

## Effect of Confirmation of the Plan

**Preservation of Avoidance Actions**

On and after the effective date, actions, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law (collectively, the "Avoidance Actions") will be preserved and retained by the Debtors.  The Debtors may offset any claim supporting an Avoidance Action against any payment due to any holder of a claim under the Plan.  In addition, if a distribution is made in error, the Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such distribution.  In the event that the Plan, as proposed, is consummated, Avoidance Actions that may potentially be brought might be waived; provided, however that such waiver will not be effective if the Plan is not effectuated.

**Retention of Jurisdiction by the Bankruptcy Court**

Notwithstanding the entry of the confirmation order and the occurrence of the effective date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any claim or interest, including the resolution of any request for payment of any administrative expense claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of claims or interests;

- Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to professionals authorized pursuant to the Bankruptcy Code or the Plan;

46

- Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure or claims arising therefrom, including cure or claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

- Ensure that distributions to holders of allowed claims and interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the effective date;

- Adjudicate, decide, or resolve any and all matters related to causes of action;

- Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- Resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with the interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan, unless as otherwise provided in such agreement or agreed to by the parties thereto;

- Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with enforcement of the Plan;

- Resolve any cases, controversies, suits, disputes or causes of action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- Resolve any cases, controversies, suits, disputes, or causes of action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a claim or interest for amounts not timely repaid;

- Enter and implement such orders as are necessary or appropriate if the confirmation order is for any reason modified, stayed, reversed, revoked, or vacated;

- Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the confirmation order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, unless as otherwise provided in such contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement or agreed to by the parties thereto;

- Enter an order or final decree concluding or closing the Chapter 11 Cases;

- Adjudicate any and all disputes arising from or relating to distributions under the Plan;

- Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the confirmation order;

- Determine requests for the payment of claims and interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the confirmation order, including disputes arising under agreements, documents or instruments executed in connection with the Plan, unless as otherwise provided in such agreement, document or instrument executed in connection with the Plan or agreed to by the parties thereto;

- Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the effective date, unless as otherwise provided in such agreement executed in connection with the Plan or agreed to by the parties thereto;

- Enforce all orders previously entered by the Bankruptcy Court; and

- Hear any other matter not inconsistent with the Bankruptcy Code.

Provided, however, that the Bankruptcy Court shall not retain jurisdiction for local, real property and tangible property tax appeals by UTGR, including real property appeals relating to assessed value as of December 31, 2006 and December 31, 2007 pending in Rhode Island Superior Court (CA No. 08-2614), real property appeal relating to assessed value as of December 31, 2008 pending with the Town of Lincoln, tangible property appeal relating to assessed value as of December 31, 2007 pending in Rhode Island Superior Court (CA No. 09-0313), and tangible property appeal relating to assessed value as of December 31, 2008 pending with the Town of Lincoln.

**Term of Bankruptcy Injunction or Stays**

<u>Injunction</u>

**From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any cause of action released or to be released pursuant to the Plan or the Confirmation Order.**

<u>Releases</u>

(A)    Releases by the Debtors

**On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees (as defined below), including:  the discharge of debt and cancellation of Equity Interests and all other good and valuable consideration transferred pursuant to the Plan, and the service of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each Released Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives, including the Sponsor Entities and Sponsor Representatives (collectively, the "<u>Debtor Releasees</u>" (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)), and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or**

related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Debtor Releasee in its own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert on behalf of any of the Debtors or in its own right or any of their Estates or against any Released Party, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release  (i) any Person or Entity (including any Released Party) from any Causes of Action arising out of the willful misconduct or gross negligence of any such Person as determined by a final order entered by a court of competent jurisdiction and (ii) any person or Entity other than a Released Party from any causes of action expressly set forth in and preserved by the Plan.  Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against any non-Released Party.

(B)    Releases by Third Parties

On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and the First Lien Agent (for the purposes of this paragraph, on behalf of itself and the First Lien Lenders) and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors or the First Lien Agent (in its capacity as administrative agent under the First Lien Facility (as defined herein)), including those in any way related to the Chapter 11 Cases, the Plan or the First Lien Facility; provided, that the foregoing "Third Party Release" shall not operate to waive or release (i) any Person or Entity (including the Debtor Releasees and the First Lien Agent) from any Causes of Action arising out of the willful misconduct or gross negligence of any such Person as determined by a final order entered by a court of competent jurisdiction and (ii) any Person or Entity (other than a Debtor Releasee or the First Lien Agent) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents. Notwithstanding anything in the Plan to the contrary, the Holders of Claims and Interests will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the non-Released Parties.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Debtor Releasees and the First Lien Agent, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Debtor Releasees or the First Lien Agent.

Nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any Claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any Claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any Claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties.  This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

The Debtors believe that the proposed non-Debtor releases contained in the Plan are appropriate because:  (i) there is an identity of interests, including an indemnity relationship, between the Debtors and

49

their current and former directors and officers; (ii) the non-Debtor releasees have contributed substantial assets to the reorganization in the form of their dedicated service to the Debtors' reorganization; (iii) the non-Debtor releases were a central component of the Restructuring Agreement, which forms the basis of the Plan, and therefore are essential to the reorganization; (iv) a substantial majority of the creditors—including the Holders of more than 99% of the overall Allowed Claims amount and the Holders of more than 90% of the Allowed General Unsecured Claims amount—do not object to the proposed releases or proposed Plan treatment; and (v) the Plan provides a mechanism for the payment of substantially all of the claims of the classes affected by the releases (i.e., payment in full of approximately 65% of general unsecured creditors).

Exculpation

The Exculpated Parties shall neither have nor incur any liability to any Entity for any Prepetition or Postpetition act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other Prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of the Releasing Parties.

## Important Securities Law Disclosure

### Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Pursuant to Exemptions under the Securities Act of 1933, as Amended

Under the Plan, all of the shares of New Common Stock will be distributed to holders of allowed First Lien Facility Claims or Newco (if created).

The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Common Stock contemplated by the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive New Common Stock or Newco Common Stock (if created) are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those persons would, however, be permitted to sell the New Common Stock or Newco Common Stock (if created) without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, holders of New Common Stock or Newco Common Stock (if created) deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws.  Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met.  These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC.  As noted in this Disclosure Statement, it is not contemplated that the Reorganized Debtors will be a public reporting company and, therefore, it is unlikely in the period initially following the effective date that current public information will be available to permit resales pursuant to Rule 144.

### Voting Instructions

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of claims in Classes A-1, A-2, A-5, B-1, B-2, B-5, C-1, C-2, C-5, and C-6.  Only the holders of claims in these classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided.

The Debtors, with the approval of the Bankruptcy Court, have engaged Donlin to serve as the Notice, Claims and Solicitation Agent for claims to assist in the solicitation process.  The Notice, Claims and Solicitation Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned claims.  The Notice, Claims and Solicitation Agent will also process and tabulate ballots for each of their respective classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the confirmation hearing.

**The deadline to vote on the Plan is [  ] p.m. (prevailing Eastern Time), on [  ], 2010.**

**BALLOTS**

Ballots must be actually received by the Notice,
Claims and Solicitation Agent by the Voting
Deadline by using the envelope provided to:

**If by mail:**

**Donlin, Recano & Company, Inc.**
**Re:  UTGR, Inc. d/b/a Twin River, et al.**
**Attn:  Voting Department**
**P.O. Box 2034**
**Murray Hill Station**
**New York, New York  10156**

**If by hand delivery or overnight courier:**

**Donlin, Recano & Company, Inc.**
**Re:  UTGR, Inc. d/b/a/ Twin River, et al.**
**Attn:  Voting Department**
**419 Park Avenue South, Suite 1206**
**New York, New York  10016**

If you have any questions on the procedure for
voting on the Plan, please call the Notice, Claims
and Solicitation Agent at the following telephone
number:

(212) 771-1128

MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN.  FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED AND RECEIVED BY [  ] P.M. (PREVAILING EASTERN TIME), ON [  ], 2010.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.

EACH HOLDER OF A CLAIM AND/OR INTEREST MAY CAST ONLY ONE BALLOT PER EACH SUCH CLAIM OR INTEREST HELD.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST IN CLASSES A-1, A-2, A-5, B-1, B-2, B-5, C-1, C-2, C-5, AND C-6 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM AND/OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS AND/OR INTEREST, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES.  IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.

## Certain U.S. Federal Income Tax Consequences of the Plan

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain holders of interests and allowed claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained as to any of the tax consequences of the Plan discussed below and the Debtors do not intend to seek a ruling from the Internal Revenue Service ("IRS") as to any such tax consequences and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of allowed claims that are not "United States persons" (as such term is defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that holders of allowed claims hold such claims as "capital assets" within the meaning of section 1221 of the IRC. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and holders of allowed claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of an interest or a claim. Each holder of an interest or a claim is urged to consult his, her, or its tax advisors with respect to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan. This discussion does not address special consideration that may be applicable to holders holding more than one class of claims. Such holders should consult their tax advisors with respect to their particular circumstances.

*IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. The tax advice contained in this Disclosure Statement was written to support the promotion or marketing of the transactions described in this Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.*

## Certain U.S. Federal Income Tax Consequences to Reorganized Company

<u>Cancellation of Debt and Reduction of Tax Attributes</u>

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of cash paid and (y) the fair market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under Chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the IRC.

As a result of the Plan, the Debtors' aggregate existing indebtedness will be substantially reduced and the Reorganized Debtors will therefore have COD Income, which will be excluded from gross income under the rules discussed above.  Because the Plan provides that holders of certain allowed claims will receive New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock exchanged therefor. This value cannot be known with certainty until after the effective date.  The Debtors expect that the Reorganized Debtors will not have any NOL carryovers available to them after emergence.

In the context of a consolidated group of corporations, current law provides for a complex ordering mechanic in determining how the tax attributes of one member can be reduced by the COD Income of another member.  These ordering rules could potentially result in a reduction in the tax attributes of a non-debtor entity in the federal consolidated tax group of which the Debtors are members.

A recently enacted amendment to the COD Income rules provides that taxpayers, including taxpayers operating under the jurisdiction of a court in a case under Chapter 11 of the Bankruptcy Code, that recognize COD Income in 2009 or 2010 may elect to forgo the COD Income exclusion and attribute reduction rules described above. Instead, the taxpayer may elect to take into taxable income the COD Income with respect to such debt in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD Income in each such year).  This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized, must be made on the taxpayer's tax return for the year that includes the transaction that creates the COD Income, and, in the case of debt of a partnership, is made at the partnership level.  The Debtors do not intend to elect to apply this new rule.

Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") each year at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for such year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, even though for regular tax purposes a corporation might otherwise be able to offset all of its taxable income by NOL carryovers from prior years, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  Because the Debtors do not expect to have NOL carryforwards available for years following the year of emergence, this rule should not directly impact the Reorganized Debtors.

**Certain U.S. Federal Income Tax Consequences to the Holders of Interests and Allowed Claims**

Consequences to Holders of Class A-7 Interests

Pursuant to the Plan, all equity interests in BLB Worldwide Holdings shall be cancelled, released and extinguished for no consideration.  For U.S. federal income tax purposes, holders of Class A-7 interests should be allowed a worthless stock deduction (unless such holder had previously claimed a worthless stock deduction with respect to any Class A-7 interests in the same taxable year in which such stock first became worthless) in an amount equal to the holder's adjusted tax basis in the Class A-7 interests.  A worthless stock deduction is a deduction allowed to a holder of a corporation's stock for the taxable year in which the stock becomes worthless.  If a holder holds its Class A-7 interest as a capital asset, the loss should be treated as a loss from the sale or exchange of such capital asset.

Consequences to Holders of Class A-1 and Class C-1 First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims and Holders of Class B-1 First Lien Facility Claims and Swap Agreements Claims - Primary Structure

Pursuant to the Plan, each holder of an allowed First Lien Facility Guarantee Claim and Swap Agreements Guarantee Claim or First Lien Facility Claim and Swap Agreements Claim against BLB Worldwide Holdings, BLB Management Services and UTGR, respectively, shall receive on the distribution date its pro rata share of (i) the New Common Stock or Newco Common Stock (if created) and (ii) the New Senior Secured Credit Facility.

For U.S. federal income tax purposes, the treatment of the exchange of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims for New Common Stock issued by BLB Worldwide Holdings and the New Senior Secured Credit Facility issued by UTGR is unclear. Such exchange may be treated (i) as a partial tax-free contribution of property to BLB Worldwide Holdings under section 351(a) of the IRC and a partial taxable exchange under section 1001 of the IRC, (ii) as a partial tax-free contribution of property to BLB Worldwide Holdings with "boot" under section 351(b) of the IRC, or (iii) as a taxable exchange under section 1001 of the IRC in its entirety.

If the exchange is treated as a partial tax-free contribution and a partial taxable exchange, a holder of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims would generally be required to bifurcate its claims and treat a portion as exchanged for New Common Stock and a portion as exchanged for the New Senior Secured Credit Facility, based on the relative value of the New Common Stock and the New Senior Secured Credit Facility received by such holder (*e.g.*, the portion of the claims deemed exchanged for New Common Stock would generally be equal to the aggregate First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims held by the holder multiplied by a fraction, the numerator of which is the value of the New Common Stock received by the holder and the denominator of which is the issue price of the New Senior Secured Credit Facility and the aggregate value of the New Common Stock received by such holder). A holder will not be required to recognize any gain or loss with respect to the portion of the First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims deemed exchanged for New Common Stock and a holder will have an initial tax basis in such New Common Stock equal to the tax basis of the claims deemed exchanged therefor. A holder's holding period for the New Common Stock should include the holding period of the claims deemed exchanged therefor. A holder will be required to recognize gain or loss with respect to the portion of the First Lien Facility Guarantee Claim and Swap Agreements Guarantee Claim or First Lien Facility Claim and Swap Agreements Claim that is deemed exchanged for the New Senior Secured Credit Facility. The amount of gain or loss recognized by a holder for such portion of claims will be equal to the difference between (a) the issue price of the New Senior Secured Credit Facility received and (b) the holder's adjusted basis in the portion of its First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims deemed exchanged for such consideration. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims were held for more than one year. Any such gain may be eligible for the installment method of reporting. To the extent that a portion of the consideration received represents accrued but unpaid interest that the holder has not already taken into income, the holder may recognize ordinary interest income. A holder's tax basis in New Senior Secured Credit Facility should equal the issue price of the New Senior Secured Credit Facility. A holder's holding period for the New Senior Secured Credit Facility should begin on the day following the exchange.

If the exchange is treated as a partial tax-free contribution of property to BLB Worldwide Holdings with "boot" under section 351(b) of the IRC, a holder of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims would generally be required to recognize gain, but not loss, equal to the lesser of (i) the amount of gain realized by the holder on the exchange or (ii) the issue price of the New Senior Secured Credit Facility received by such holder. The amount of gain, if any, realized by a holder on the exchange will be equal to the excess of (a) the issue price of the New Senior Secured Credit Facility and the fair market value of the New Common Stock received by such holder over (b) the holder's adjusted basis in its First Lien Facility Guarantee Claim and Swap Agreements Guarantee Claim or First Lien Facility Claim and Swap Agreements Claim surrendered. Such gain may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain if the First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims were held for more than one year. Any such gain may be eligible for the installment method of reporting. To the extent that a portion of the consideration received represents accrued but unpaid interest that the holder has not already taken into income, the holder may recognize ordinary interest income. A holder's basis in the New Common Stock received should be equal to its basis in the First Lien Facility Guarantee Claim and Swap Agreements Guarantee Claim or First Lien Facility Claim and Swap Agreements Claim surrendered, increased by any gain recognized on the exchange and decreased by the issue price of the New Senior Secured Credit Facility received by such holder. A holder's holding period for the New Common Stock should include the holding period of the claims deemed

55

exchanged therefore  A holder's basis in the New Senior Secured Credit Facility received should be equal to the issue price of such New Senior Secured Credit Facility and its holding period should begin on the day following the exchange.

If the exchange is treated as a taxable exchange under section 1001 of the IRC in its entirety, a holder of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims would generally be required to recognize gain or loss equal to the difference between (a) the issue price of the New Senior Secured Credit Facility and the fair market value of the New Common Stock received by such holder and (b) the holder's adjusted basis in its First Lien Facility Guarantee Claim and Swap Agreements Guarantee Claim or First Lien Facility Claim and Swap Agreements Claim surrendered.  Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claim were held for more than one year.  Any such gain may be eligible for the installment method of reporting.  To the extent that a portion of the consideration received represents accrued but unpaid interest that the holder has not already taken into income, the holder may recognize ordinary interest income.  A holder's basis in the New Common Stock received should be equal the fair value of such stock and a holder's holding period for the New Common Stock should begin on the day following the exchange.  A holder's basis in the New Senior Secured Credit Facility received should be equal to the issue price of such New Senior Secured Credit Facility and its holding period should begin on the day following the exchange.

<u>Consequences to Holders of Class A-1 and Class C-1 First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims and Holders of Class B-1 First Lien Facility Claims and Swap Agreements Claims - Alternative Structure</u>

As noted in the Plan, the holders of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claim against BLB Worldwide Holdings, BLB Management Services and UTGR, respectively, may organize Newco and transfer their First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claims to Newco in exchange for the stock of Newco and the right to receive the New Senior Secured Credit Facility.

For U.S. federal income tax purposes, the treatment of the exchange of First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims or First Lien Facility Claims and Swap Agreements Claim for New Common Stock and the New Senior Secured Credit Facility is unclear.  Such exchange may be treated (i) as a partial tax-free contribution of property to Newco under section 351(a) of the IRC and a partial taxable exchange under section 1001 of the IRC, (ii) as a partial tax-free contribution of property to Newco with "boot" under section 351(b) of the IRC, or (iii) as a taxable exchange under section 1001 of the IRC in its entirety.  The federal tax consequences arising from each potential characterization is the same as described above under the heading "Consequences to Holders of Class A-1 and Class C-1 First Lien Facility Guarantee Claims and Swap Agreements Guarantee Claims and Holders of Class B-1 First Lien Facility Claims and Swap Agreements Claims - Primary Structure."

<u>Consequences to Holders of Class A-2 and C-2 Second Lien Facility Guarantee Claims and Class B-2 Second Lien Facility Claims</u>

Pursuant to the Plan, each holder of an allowed Second Lien Facility Guarantee Claim or Second Lien Facility Claim against BLB Worldwide Holdings, BLB Management Services and UTGR, respectively, shall receive on the distribution date its pro rata share of the Second Lien Facility Claim Contingent Value Right.

The U.S. federal income tax treatment of the Second Lien Facility Claim Contingent Value Right is unclear, and holders of such right are urged to consult their own tax advisors regarding such treatment.  Treatment of the Second Lien Facility Claim Contingent Value Right will depend in part on whether the receipt of such rights is a "closed transaction" or an "open transaction" and whether the right is treated as a right to payment under a contract or as a debt instrument for U.S. federal income tax purposes.  In general, the Debtors intend to take the position that closed transaction treatment applies to the issuance of the Second Lien Facility Claim Contingent Value Right.  Open transaction treatment should apply only if the fair market value of the Second Lien Facility Claim Contingent Value Right cannot be ascertained at the time of the exchange, and the IRS has taken the position that only in "rare and extraordinary circumstances" is the value of property so uncertain that

open transaction treatment is available.  The IRS is not bound by any position taken by the Debtors, and may characterize the Second Lien Facility Claim Contingent Value Right as a debt instrument or otherwise.  If the IRS disagrees with any position taken by the Debtors, the tax treatment to holders receiving the Second Lien Facility Claim Contingent Value Right in exchange for allowed claims may be materially different from the treatment described below.

Assuming closed transaction treatment applies, the receipt of the Second Lien Facility Claim Contingent Value Right by a holder of a Class A-2, Class B-2, or Class C-2 claim in satisfaction of its claim should be treated as a taxable exchange under section 1001 of the IRC.  Assuming the claim is held as a capital asset, the holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the fair market value of the Second Lien Facility Claim Contingent Value Rights received and (y) the holder's adjusted tax basis in its claim. To the extent that the consideration received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income.

If a payment is made in a future taxable year with respect to the Second Lien Facility Claim Contingent Value Right, each holder generally should recognize gain in the amount by which such payment (other than the portion characterized as interest as discussed below) exceeds the holder's tax basis in its Second Lien Facility Claim Contingent Value Right.  If no payment is made, or if the payment is less than the holder's tax basis in its Second Lien Facility Claim Contingent Value Right, the holder generally should recognize a loss.  Assuming the receipt of the Second Lien Facility Claim Contingent Value Right is treated as a closed transaction, the character of any gain or loss recognized by a holder in a future taxable year with respect to the Second Lien Facility Claim Contingent Value Right generally is unclear.  In addition, a deferred payment given as consideration in exchange for non-publicly traded property generally must provide for adequate stated interest or a portion of the payment will be characterized as interest for U.S. federal income tax purposes.  Generally, section 483 of the IRC applies to contracts for the sale or exchange of property if the contract provides for one or more contingent payments.  Contingent payments are accounted for when payment is made.  Under section 483, a portion of a contingent payment equal to the amount of "unstated interest" is treated as interest, and the rest of the payment is treated as a receipt of the sales price.  "Unstated interest" represents the excess of (x) the total deferred payments (*i.e.*, all payments due more than six months after the date of the sale or exchange) over (y) the aggregate present value of all deferred payments plus any stated interest.  The recipient must include this interest in taxable income in the taxable year in which the payment is made.  Accordingly, if the exchange of a Class A-2, Class B-2, or Class C-2 claim for a Second Lien Facility Claim Contingent Value Right is characterized as a closed transaction and the right is characterized as the receipt of a deferred payment obligation (rather than the receipt of property), a holder may be required to treat a portion of any payments received with respect to the Second Lien Facility Claim Contingent Value Right as imputed interest in the year of receipt.

Finally, if open transaction treatment applies to a holder's receipt of the Second Lien Facility Claim Contingent Value Right, the holder generally would not take the Second Lien Facility Claim Contingent Value Right into account on the effective date for purposes of determining gain or loss with respect to the exchange.  Instead, the holder generally would take no tax basis in the Second Lien Facility Claim Contingent Value Right, but would be subject to tax as payments with respect to such right is made or deemed made in accordance with the holder's regular method of accounting.  The holder generally would treat a portion of such payments as interest income under section 483, then as recovery of tax basis in the holder's allowed claims, and the balance as gain.  To the extent the holder has unrecovered tax basis in its allowed claims after receipt of all payments pursuant to the Second Lien Facility Claim Contingent Value Right, the holder generally should recognize a loss.  Any recognized gain or loss generally should be capital or ordinary depending on the nature of the holder's interest in its allowed claims.

<u>Consequences to Holders of Class A-5 and Class B-5 General Unsecured Claims and Rejection Damage Claims</u>

Pursuant to the Plan, each holder of an allowed general unsecured claim and/or an allowed rejection damages claim against BLB Worldwide Holdings and BLB Management Services, respectively, shall be paid an amount equal to 65% of their allowed general unsecured claim and/or allowed rejection damages claim in cash on the distribution date or as soon thereafter as is practicable.

The receipt of cash by a holder of a Class A-5 or Class B-5 claim in satisfaction of its claim should be treated as a taxable exchange under section 1001 of the IRC.  Assuming the claim is held as a capital asset, the holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of cash received and (y) the holder's adjusted tax basis in its claim.  To the extent that the cash in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income.

> Consequences to Holders of Class C-5 General Unsecured Claims, the RIGOA Claim, the Dimeo Claim, and Rejection Damage Claims, and Class C-6 Convenience Claims

Pursuant to the Plan, each holder of an allowed general unsecured claim, the RIGOA claim, the Dimeo Claim, and/or an allowed rejection damages claim against UTGR (each, a "Class C-5 Claim") shall be paid an amount equal to 65% of their allowed Class C-5 Claim in cash on the distribution date or as soon thereafter as is practicable.  Also pursuant to the Plan, each holder of an allowed Class C-6 Claim that elects to be treated as a holder of a convenience claim in Class C-6 shall be paid up to $2,500 in cash on the distribution date or as soon thereafter as is practicable.

The receipt of cash by a holder of a Class C-5 Claim or a Class C-6 claim in satisfaction of its claim should be treated as a taxable exchange under section 1001 of the IRC.  Assuming the claim is held as a capital asset, the holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of cash received and (y) the holder's adjusted tax basis in its claim. To the extent that the cash in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income.

**Accrued But Untaxed Interest**

A portion of the consideration (whether cash, New Common Stock, New Senior Secured Credit Facility or other consideration) received by holders of claims may be attributable to accrued but untaxed interest on such claims.  Such amount should be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes.  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in income and is not paid in full.

If the fair value of the consideration received by holders of claims is not sufficient to fully satisfy all principal and interest on allowed claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to holders of allowed claims will first be treated as first satisfying an amount equal to the state principal of such claim and any remaining consideration as satisfying accrued but unpaid interest.  It is not certain that the IRS will respect such an allocation.  Holders of claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**Market Discount**

As indicated above, certain holders of allowed claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on such holder's allowed claim.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is

not a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a holder on the taxable disposition of an allowed claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the allowed claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that any allowed claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the allowed claims (*i.e.*, up to the time of the exchange) but was not recognized by the holder is carried over to the property received therefore, and any gain recognized on a subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

**Effect of Potential Future Distributions**

Certain holders of allowed claims may receive distributions after the effective date. The imputed interest provisions of the IRC may apply to treat a portion of the distributions to such holders as imputed interest. With respect to such holders, imputed interest may accrue over time using the constant interest method, in which case such holders may be required to include imputed interest in income prior to the actual distribution. It is possible that recognition of any loss realized by a holder of an allowed claim may be deferred until such holder can no longer receive future distributions under the Plan. It is also possible that any gain realized by a holder of an allowed claim in respect of distributions under the Plan may be deferred under the "installment method" of reporting. Deferral of gain recognition may not be advantageous to a particular holder, and, accordingly, holders of allowed claims should consider the desirability of making an election to forego application of the installment method. Holders of allowed claims are urged to consult their own tax advisors regarding the possibility for deferral of recognition of gains and losses and the possibility of electing out of the installment method of reporting any gain realized in respect of their allowed claims.

**Certain Tax Consequences of Owning New Common Stock and New Senior Secured Credit Facility**

Interest payments and original issue discount ("OID"), if any, on the New Senior Secured Credit Facility will be taxable to holders as ordinary income. The New Senior Secured Credit Facility will be considered to be issued with OID if its "stated redemption price at maturity" (*i.e.*, the sum of all payments to be made on facility other than "qualified stated interest") exceeds its "issue price" (discussed below). Under the rules governing OID, regardless of a U.S. holder's method of accounting, a U.S. holder will be required to accrue its pro rata share of OID on the New Senior Secured Credit Facility on a constant yield basis and include such accruals in gross income, whether or not such U.S. holder receives a cash payment of interest on facility on the scheduled interest payment date.

The issue price of the New Senior Secured Credit Facility will depend on whether a substantial amount of the First Lien Facility Claims or New Senior Secured Credit Facility is considered to be "traded on an established market." In general, a debt instrument will be treated as traded on an established market if (a) it is listed on (i) the New York Stock Exchange or certain other qualifying national securities exchanges, (ii) certain qualifying interdealer quotation systems or (iii) certain qualifying foreign securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value by disseminating either recent price quotations of identified brokers, dealers, or traders or actual prices of recent sales transactions; or (c) subject to certain limitations, price quotations are readily available from dealers, brokers or traders.

If neither the First Lien Facility Claims nor New Senior Secured Credit Facility is traded on an established market, the issue price of the New Senior Secured Credit Facility would equal to its stated principal amount. If the First Lien Facility Claims are traded on an established market, and the New Senior Secured Credit Facility is not so traded, the issue price would be equal to the fair market value of the First Lien Facility Claims on the date the New Senior Secured Credit Facility is issued. If the New Senior Secured Credit Facility is traded on an established market, its issue price would equal the fair market value of the New Senior Secured Credit Facility on the date it is issued.

If either the First Lien Facility Claims or New Senior Secured Credit Facility are traded on an established market during the relevant time period and the fair market value of First Lien Facility Claims or New Senior Secured Credit Facility, as of the date of the exchange, is less than the stated redemption price at maturity of the New Senior Secured Credit Facility, the excess of the stated redemption price at maturity of the New Senior Secured Credit Facility over its issue price will be treated as OID.

Upon the taxable sale, exchange or retirement of the New Senior Secured Credit Facility, a holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than accrued but unpaid interest which will be taxable as such, and such holder's adjusted tax basis in the New Senior Secured Credit Facility.  Such gain or loss generally will be capital gain or loss.

Distributions, if any, on the New Common Stock that are paid out of the current or accumulated earnings and profits (as defined for U.S. federal income tax purposes) of the Reorganized Debtors (or Newco, if applicable) will generally be treated as dividends includible in income by the holder when received or accrued in accordance with the holder's method of accounting for U.S. federal income tax purposes.  To the extent, if any, that a holder receives a distribution on its New Common Stock and the amount of the distribution exceeds the Reorganized Debtors' current and accumulated earnings and profits, the distribution will be treated first as a non-taxable return of capital reducing the holder's basis in such New Common Stock.  Any distribution in excess of the holder's basis in its New Common Stock will be treated as capital gain.  A sale, exchange or other disposition of the New Common Stock generally will result in taxable gain or loss to the holder equal to the difference between the amount received and the holder's adjusted tax basis in such New Common Stock.  Such gain or loss generally will be capital gain or loss (with certain exceptions to the extent that a holder previously claimed a bad debt deduction or recognized an ordinary loss with respect to such holder's allowed claims) and will be long-term capital gain or loss if the holding period for such New Common Stock exceeds one year at the time (subject to the "market discount" rules described above).

**Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a holder of a claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the IRC.

The U.S. federal income tax consequences of the Plan are complex.  The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a claim in light of such holder's circumstances and income tax situation.  All holders of claims against the Debtors should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the restructuring, including the applicability and effects of any state, local, or foreign tax laws, and any change in applicable tax laws.

**Recommendation**

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of allowed claims than proposed under the Plan.  Accordingly, the Debtors recommend that holders of claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

UTGR, INC.
(for itself and on behalf of each of the Debtors)

By:/s/ *George Papanier*
   Name:  George Papanier
   Title: President and Chief Operating Officer

Prepared by:

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
(212) 446-4800 (telephone)
/s/ *Paul M. Basta*
Paul M. Basta
Stephen E. Hessler

WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, Rhode Island  02903
(401) 273-8300 (telephone)

Counsel to the Debtors and Debtors in Possession