```
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - -x
In re:                              :

UTGR, INC., d/b/a TWIN RIVER, et al:   BK No. 09-12418
          Debtors                      Chapter 11

- - - - - - - - - - - - - - - - - -x
```

## ORDER DIRECTING DEBTORS TO FILE STATUS REPORT

Beginning in late 2010, and thereafter, the professionals filed their Applications for Final Compensation for services rendered in these cases, and a hearing on the applications was held on March 22, 2011. On May 23, 2011, the Debtors filed a Motion for Entry of Final Decree, stating that the Plan of Reorganization had been fully consummated (except for decision on the professional fees), and that the claims reconciliation process was complete. While these two motions were under advisement and being considered by the Court, several reports concerning the Debtors appeared in *The Providence Journal* raising issues previously unknown to this Court, but which are clearly of interest as to what is left to be accomplished in these cases, including the Debtors' often stated completion of their goals and initiatives. Because such reports are coming to the Court's attention only through non-judicial sources,[1] which are attached as Exhibit A (April 20, 2011); Exhibit

---

[1] E.g., Michael P. McKinney and Katherine Gregg, *Vote requested on table games*, The Providence Journal, Apr. 20, 2011 at A1; Katherine Gregg, *Narragansett Tribe questions plan for Twin River*, The Providence Journal, Apr. 29, 2011 at A1; Katherine Gregg, *Twin River pushes for gambling referendum, The Providence Journal*, May 26, 2011 at A1. The Court takes judicial notice of

BK No. 09-12418

B (April 29, 2011); Exhibit C (May 26, 2011), ordinary prudence calls for a closer look at references to possible conflict(s) of interest, and the Debtors' and the Rhode Island Department of Business Regulation's reluctance to disclose ownership interests and/or possible conflicts that were not addressed during the pre-confirmation part of the case.

Because these issues are not being brought to the Court's attention through traditional channels (i.e., from the Debtors),[2] the Court shall temporarily withhold entry of Final Decree and will not rule on any pending applications or motion(s) until the following issues are addressed:

A. Any actual or apparent "conflict[s] of interest" discussed in Exhibit B, the published report dated April 29, 2011, including the present status of such issues.

B. The Debtors' new need for table games as a condition of their future viability. This did not appear to concern the Debtors

---

these published reports, which are attached and made a part of this Decision. Fed. R. Evid. 201. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,569, n.13 (2007) "District Court was entitled to take notice of the full contents of the published [newspaper] articles referred to in the complaint.")

[2] "It is appropriate [and perhaps now necessary] to remind counsel that they have a continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation." *Board of License Commissioners of Tiverton v. Pastore*, 469 U.S. 238,240 (1985)(citations and internal quotation marks omitted).

BK No. 09-12418

who, at the March 22 hearing or at any other pre-confirmation time, suggested simplistically that the Debtors' huge reduction of their secured debt as part of the reorganization will assure their ability to meet and handle any threat of competition by neighboring gaming facilities.

C. Clarification of the Debtors' now conflicting assessments of their prospects going forward, i.e., the assurances offered to the Court on March 22, 2011, by the Debtors' General Counsel and Vice President, Craig Eaton.[3] Compare Eaton's testimony with the Debtors' public statement made less than one month later, describing their present situation as "desperate." E.g., Ex. A, "Twin River's owners contend the ability to offer traditional casino fare, such as blackjack, is the slot parlor's *only hope* of remaining competitive if Massachusetts enters the casino and slot business." (Emphasis added.) Ex. C, John Taylor, Chairman of the Twin River Board of Directors told a Rhode Island legislative committee, "The threats [of Massachusetts jumping into the gambling

---

[3] Addressing the Court's concern about the Debtors' future regarding prior cases in which overconfident talk was followed by the post-confirmation debtor's sudden failure, Mr. Eaton stated that he was "very comfortable we'll be a viable entity for a long time," (Hearing Transcript [Doc. No. 857] at 48:48 et seq.), based on the Debtors' reduction of their secured debt by nearly $300,000,000, as part of the reorganization. Also, at the conclusion of the Court's colloquy with Eaton, Debtors' local counsel rose to assure the Court that a big difference between this case and *Almacs* is that Twin River is strictly regulated. *In re Almacs,* 178 B.R. 598,603 (Bankr. D.R.I. 1993).

3

BK No. 09-12418

business with one or more resort-style casinos and slots at its tracks] are significant and could be devastating."

Most important to the Court in this inquiry is – when were Mr. Taylor's and his colleagues' concerns known to the Debtors? Depending on the informational value of the report, and recognizing that the Debtors have in fact achieved many of their stated initiatives, the Court will decide whether to examine the entire pre and post-confirmation proceeding(s), and to consider whether it is necessary or appropriate to correct any rulings or approvals that may have been entered improvidently.

Throughout this case, the impression is that the Debtors have kept the Court minimally informed, on a "need to know" basis, only with "good news."  The lengthy and wide-ranging hearing on final fee applications reflects this Court's ongoing concern that the Debtors' reluctance to share relevant information was effectively precluding anyone from being adequately informed about their condition and progress as the Chapter 11 case was proceeding.  The April 29, 2011, article (Ex. B) speaks of a previously undisclosed potential conflict of interest of one of the new owners of Twin River.  The credible mention of a possible conflict of interest is cause for this Court to hold things in abeyance while taking a look at the Debtors' present status, compared with their pre-confirmation representations.  Whether real issues need to be

BK No. 09-12418

addressed, or whether they are baseless rumors, deserves scrutiny, at least.[4] The culture of this case fits within the pattern of the Debtors' regularly scheduled series of omnibus hearings and reports which featured boilerplate recitals of prior activities and canned rhetoric, far over substance. Throughout the travel of the case it is apparent, especially in hindsight, that the information provided in selective and conclusory fashion, and the way in which the Court was "kept advised," effectively avoided the element of meaningful disclosure required and expected in all judicial proceedings. For anyone already critical of the process, this case will not reduce skepticism.

Finally, given the skill level and experience of the professionals involved, they are all charged with knowing that they had available the well-established practice of keeping the Court reasonably informed through *in camera* communications, while protecting sensitive and/or confidential information. None was offered or ever suggested here. *See Kerr v. United States District Court*, 426 U.S. 394,405 (1976) (In camera review of documents "is a relatively costless and eminently worthwhile method" to resolve issues of non-disclosure.) Since the Debtors have chosen to

---

[4] On May 5, 2011, the Court requested from the Rhode Island Department of Business Regulation, a copy of the letter upon which Ex. B was based. The Department has not responded, and the Court is now expecting that issue to be addressed in the Debtors' written response on July 31, 2011.

BK No. 09-12418

operate below the radar, they should now give meaningful and concise responses to these questions.

Although the Court is mindful of the sua sponte nature of this inquiry, it is what it is, and with no questions coming from any other quarter, either insider or adversarial, this Court still has the sometimes unpleasant obligation to ask questions, when no one else does. The Debtors shall file their response(s) on or before July 31, 2011.

Entered as an Order of this Court.

Dated at Providence, Rhode Island, this 28th day of June, 2011.

                                  Arthur N. Votolato
                                  U.S. Bankruptcy Court

Entered on docket: 6/28/11



# Rhode Island Casino

# Vote requested on table games

01:00 AM EDT on Wednesday, April 20, 2011

By Michael P. Mckinney and KATHERINE GREGG

Journal Staff Writers

LINCOLN — The Town Council approved a resolution Tuesday night asking the General Assembly to let town residents vote on a binding ballot question on whether to allow table games at Twin River.

The council approved the resolution on a vote of 3 to 2.

Council President Keith E. Macksoud said that if the proposal seeking additional gambling in Rhode Island were to come to fruition — or if it were expanded in Massachusetts, too — this resolution "ensures that the town would be able to have a voice in what happens at Twin River."

Macksoud cited proposed legislation that calls for creating a casino on the Providence waterfront or in other areas of the state.

If those came about, he said, the town could lose significant revenue.

But Councilman John W. Flynn voted against the resolution. He warned that by approving the resolution the town was initiating a process by which there was no guarantee of financial benefit to the town.

"I really think the responsible thing would be to postpone this until we can get more information," he said.

The resolution, approved unanimously by the council's Ordinance Committee on Monday, proposes Lincoln voters consider this question: "Shall an act be approved which would authorize the facility known as 'Twin River' in the town of Lincoln to add state-operated casino gambling, such as table games, to the types of gambling it offers?"

State law requires state and local approval, at a referendum, for any new kind of gambling. It spells out things that must happen before the legislature considers a bill to place a gambling proposal on the ballot, and the list begins with passage by the local city or town council of a resolution seeking a referendum. The law will govern what, if anything, happens next after lawmakers return from spring break next week.

The town expects to receive $6.2 million of Twin River's video-slot revenue this year and $5.5 million when its share is scheduled to drop next year.

Speaking by telephone Tuesday, Macksoud, who submitted the resolution, said he lives about a mile and a half from Twin River and can personally vouch that overnight gambling has not created feared problems.

In a 2007 non-binding referendum, the town's voters overwhelmingly opposed gambling expansion, including 24-hour gambling. Although that ballot was broadly worded, Macksoud said voters were also implicitly asked if they wanted a full-fledged casino in their backyard and "I am not sure if the voters understood what that meant. Did full-fledged mean table-games … [or] a hotel and amenities equivalent to Foxwoods and Mohegan Sun?"

Four years later, Macksoud said "I think we understand'" that competition from across the border "will impact the revenue generated at Twin River and if the VLT revenue goes down … our income would go down, and we'd either have to make more budget cuts or do something [else] to make up for that shortfall."

But the proposed resolution raised concerns from a former Lincoln Town Council president, Dean Lees Jr., who said Tuesday it "does more damage to the town of Lincoln than it helps" because in his view it provides no regulatory control to the town and its residents and would give the state "carte blanche" to do what it wants.

The Chafee administration is nearing a decision on whether to hire a consultant to study potential financial and societal implications of allowing more gambling opportunities in Rhode Island, where video slots are already the third-largest source of revenue for state government. In 2010, the two video-slot parlors — Twin River and Newport Grand — produced a total of $289.1 million for the state treasury.

The financial institutions that acquired Twin River when it emerged from bankruptcy last year have launched a drive for a statewide vote to allow table games. Chafee responded by suggesting an unspecified role for the state's Narragansett Indians in any gambling expansion, and then suggesting the need for a study of how much Rhode Island stands to lose or gain from competition including, for example, from three privately run casinos in Massachusetts, a possible Wampanoag Indian casino in Southeastern Massachusetts and the introduction of slots at Bay State tracks.

It would then look at potential impact on state revenue here of allowing table games at both Twin River and Newport Grand, with and without competition from Massachusetts, and what might happen if the Narragansetts were able to buy Twin River.

The Chafee administration has not yet decided whether to hire any one of the five individuals and companies that expressed interest in doing the study. They include Gaming Market Advisors of Denver, Colo.; Larisa Law of Rhode Island; Marquette Advisors of Minnesota; Oliver Wyman of New York; and Spectrum Gaming Group LLC of New Jersey.

Asked for an update this week, Chafee spokesman Michael Trainor said in a statement Monday: "Developing a strategy to respond to the rapidly changing gaming environment, particularly in Massachusetts and in Congress, is a top priority of the Chafee administration. The governor has asked appropriate cabinet members and senior staff to accelerate review, this week, of the five responses to the Request for Information concerning the conduct of a gaming study."

Twin River's owners contend the ability to offer traditional casino fare, such as blackjack, is the slot parlor's only hope of remaining competitive if Massachusetts enters the casino and slot business.

Rep. William San Bento, D-Pawtucket, and chairman of the legislature's Lottery oversight-commission, has expressed interest in introducing the bill that Twin River is seeking.

KEY POINTSTable games at Twin River?

Local referendum The Town Council approves a resolution asking the General Assembly to give Lincoln voters the chance to decide whether Twin River is allowed "to add state-operated casino gaming, such as table games, to the types of gambling it offers."

General Assembly If the General Assembly approves legislation for the referendum, the local board of canvassers places the question on the local ballot, while the secretary of state places it on the statewide ballot.

Voters Statewide and local approval is required. The potential date of a vote was uncertain.

kgregg@projo.com



# Rhode Island news

Comments 3 | Recommend  0

# Narragansett Tribe questions plan for Twin River

01:00 AM EDT on Friday, April 29, 2011

By Katherine Gregg

Journal State House Bureau



Rep. William San Bento, foreground, at the State House Thursday, has introduced legislation to place a referendum on the 2012 ballot on whether to authorize table games at Twin River.

The Providence Journal / Connie Grosch

PROVIDENCE — The chief sachem of the Narragansett Indian Tribe is questioning the legality of allowing full-scale casino gambling at the privately owned Twin River slot parlor under the terms proposed in a bill introduced in the House on Wednesday.

Meanwhile, state business regulators have acknowledged for the first time that they are investigating a co-owner's potentially conflicting interest in turning the Suffolk Downs racetrack in Boston into a casino.

The latter development raises new questions about who stands to gain from Twin River's bid to morph from a slot parlor with acres of electronic gambling machines into a "state-operated casino" offering a full menu of casino-style games, including craps, roulette and blackjack.

"On a quick glance, the issue of operation and ownership creates a problem constitutionally," said Chief Sachem Matthew Thomas of the casino-referendum bill that Rep. William San Bento, D-Pawtucket, introduced in the House at Twin River's behest.

He said the proposal runs up against the same constitutional prohibition against privately operated gambling that stymied more than one of his tribe's earlier efforts to get into the casino business.

"The [owner] of the gaming facility is not the State of Rhode Island, but a private company that houses machines for the state at a benefit, regardless of the split," said Thomas, citing a 2005 Rhode Island Supreme Court ruling that foiled his tribe's effort to get on the ballot that year.

As was true for his tribe, "the owners of Twin River cannot have casino operations or casino games without a constitutional amendment," he argued.

But a spokeswoman for Twin River disputed his interpretation of the Supreme Court opinion, and stated that Twin River is on "the right side of the law" and that Thomas is incorrect when he equates ownership with "state operation."

The state Department of Business Regulation is delving into a different issue, raised by Twin River's own lawyers in response to a bid by Apollo Management LP to up its financial stake in the Lincoln slot parlor.

Wells Fargo-Wachovia and a division of Bain Capital in Boston, known as Sankaty, are among the financial institutions that have owned Twin River since it emerged from bankruptcy late last year.

Twin River's New York-based law firm of Jones Day laid out this scenario in an April 25 letter to the two state agencies that regulate the slot parlor: the DBR and the state Lottery.

It begins: "We write to bring to your attention certain developments relating to the proposed Suffolk Downs casino in East Boston, Massachusetts."

Citing "published reports," the letter says: "Apollo Management LP, through subsidiary entities, has a 50-percent common stock interest in Caesar's Entertainment Corporation (formerly Harrah's Entertainment Corporation), which it acquired with another private equity firm in January 2008."

At this point, "Apollo (through another controlled affiliate) owns 4.99 percent of the total outstanding shares of Twin River Common Stock," but is seeking DBR approval to "increase its ownership position in Twin River to up to 20 percent," which would make it Twin River's largest single shareholder. At the same time, Caesar's Entertainment has struck a reported deal to "manage the casino" at the $600-million "gaming resort" that Suffolk Downs wants to build in East Boston.

Lawyer Robert A. Profusek advised the Rhode Island regulators that Twin River Worldwide Holdings felt compelled to disclose these interconnections under a compliance agreement, requiring the

immediate disclosure of any involvement by any investor with, at minimum, a 5-percent ownership interest, in Twin River in a "competitive facility."

The concerns for Twin River are twofold: compliance and potential competitive disadvantages if an owner with significant stake in a competing venue in Massachusetts had a seat at the table.

"While Apollo holds less than 5 percent of Twin River's outstanding common stock at this time, given [Twin River's] compliance obligations … and Apollo's application to increase its ownership position in Twin River, we believe that it is necessary for Twin River to bring the Suffolk Downs development to your attention," the letter said.

Deputy DBR Director Louis DeQuattro said Apollo's application to increase its Twin River ownership is still under investigation. In light of Twin River's letter, he said the DBR now feels compelled to ask "what their intentions are, and what they are attempting to do … Don't know the exact relationship between the parties. That's something we are going to have to figure out."

The letter came to light on the day after San Bento introduced a bill seeking to place this question before voters at the next general election in November 2012: "Shall an act be approved which would authorize the facility known as Twin River in the Town of Lincoln to add state-operated casino gaming, such as table games, to the types of gambling it offers?"

Twin River is currently home to about 4,750 electronic gambling machines, including "virtual" blackjack, placed there by the state Lottery under terms where the state keeps 61 cents out of every dollar a gambler leaves behind.

The amount of money at stake is not small. The state's share of the $429.8 million in net income from Twin River alone is a projected at $261.4 million this year.

Asked how much Twin River proposes as a state share of the new table-game revenue, spokeswoman Patti Doyle said: "The intent on the table-game tax rate is to start a dialogue with state officials on an appropriate tax structure. The national average on table games is 12 percent. I offer that to you just as an FYI. Labor costs are significantly higher on table games as compared to VLTs, so the tax rate is always lower."

But "we have no plans to request a change to the current VLT tax rate," she said.

kgregg@projo.com



# Rhode Island news

Comments 1 | Recommend 0

# Twin River pushes for gambling referendum

01:00 AM EDT on Thursday, May 26, 2011

By Katherine Gregg

Journal State House Bureau



Narragansett Indian Chief Sachem Matthew Thomas, left, waits to testify before the House Finance Committee, along with the tribe's attorney, Jack Killoy.

The Providence Journal / Connie Grosch

PROVIDENCE — Amid questions about how much Rhode Island's first casino license is worth, the operators of the Twin River slot parlor went to the State House Wednesday to plead their case for a voter referendum on their bid to turn the former dog track into a full-scale casino with blackjack and other table games currently banned in Rhode Island.

They brought promises of 650 new jobs in the Lincoln gambling hall and the businesses that feed it, including 378 at Twin River alone. They brought a glowing letter of endorsement from the secretary-treasurer of the 7,500-member Teamsters, Local 251, that said: "Nothing is as important to me, my fellow leaders of Local 251, and in fact, our entire membership than securing and keeping good paying jobs in Rhode Island."

But the Narragansett Indians' Chief Sachem Matthew Thomas was not alone in questioning why the lawmakers would consider giving the owners of the privately owned Twin River the opportunity to become Rhode Island's first and only casino without requiring a licensing fee.

Remembering the legal, political and financial hurdles his own tribe faced in trying to persuade lawmakers to put his own tribe's doomed casino proposal on the ballot, Thomas told the House Finance Committee: "We were forced to commit to a $100-million licensing fee up-front.

"Even Massachusetts has asked for up to $250 million in up-front licensing fees," Thomas said. "This legislation has $0 for a licensing fee ... Where's the taxpayer protection? Is it a 'work it out later' deal?" No votes were taken Wednesday, and no questions about the potential for a licensing fee were asked of the Twin River executives who testified at Wednesday's committee hearing, though CEO George Papanier said Twin River was willing to talk specifics with the state at any time.

But when House Speaker Gordon D. Fox was asked a short time later whether lawmakers were likely to approve the proposed 2012 referendum before wrapping up their regular session next month, he said, they first need to assure themselves "the financial projections are real," and he personally considers a licensing fee as "one of those discreet issues that needs to be explored."

"I tend to support licensing fees," Fox said.

There was no direct response from Twin River's owners to his comments or to the arguments raised during the hearing by the Rev. Eugene McKenna, leader of the Rhode Island anti-casino drive, and Les Bernal, executive director of the Washington-based Stop Predatory Gambling.

Asserting that "casinos make 90 percent of their profits from 10 percent of the gamblers," Bernal said: "It is the most predatory business in the country and its business model is based on addiction and pushing people into debt — a truth that remains unchanged whether they are operated by a Native American Indian tribe, a dog track, the local fraternal organization or state government."

Open around-the-clock now, Twin River is home to about 4,750 electronic gambling machines, including virtual blackjack, placed there by the state Lottery under terms where the state keeps roughly 61 cents out of every dollar a gambler leaves behind.

This year's bill, sponsored by Rep. William San Bento, D-Pawtucket, does not specify the state's share of revenue from the 100 or more table games that Twin River wants to add to its gambling menu. This was one of the unanswered questions that former Gov. Donald L. Carcieri cited last year when he vetoed an earlier bill to place Twin River's casino bid on the November 2012 ballot.

Then as now, Twin River's owners stressed the potential threat to Rhode Island's third-largest source of state revenue if Massachusetts jumps into the gambling business with one or more resort-style casinos and slots at its tracks.

"The threats are significant and could be devastating," John Taylor, chairman of the Twin River board of directors, told the lawmakers again Wednesday. "Over half of our customers today come from

Massachusetts. Many strongly believe that casinos in Massachusetts are a question of when, not if. And, we, as a business, need to be able to react and prepare for the fight ahead."

In his analysis, Twin River's consultant at The Innovation Group assumed: there would be 65 table games initially, but no limit on the number of "competitive" table games that Twin River could ultimately offer and an "effective tax rate of 12 percent of gross table game revenue."

That would reduce Rhode Island's share of Twin River's gambling revenue to a projected 53.68 percent.

According to consultant Steve Rittvo, that would still be higher than the effective gaming tax rates in 11 other states, including Connecticut, New Jersey and Nevada. Were it any higher, Rittvo said, Twin River's owners wouldn't be able to effectively market the casino.

Rittvo projected that Twin River's gross revenue would increase from an assumed $449 million in fiscal year 2013 with slots only, to $568.5 million with table games, with the state and local taxes growing that year by a projected $22.5 million, compared with a potential loss of at least $75 million (27 percent) if Massachusetts allows casino gambling and Twin River is unable to compete.

Asked by Rep. Laurence Ehrhardt, R-North Kingstown, why his analysis did not show how much Twin River might gain or lose in the face of competition from Massachusetts if it had table games, Rittvo said there were too many unknowns, and it could go either way, but table games would at least mitigate Twin River's losses.

kgregg@projo.com